# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed:  May 14, 2018
**(Not to be Published)**

```
* * * * * * * * * * * * * * * * * * * *
THOMAS PRESTIA,                      *
                                     *      No. 17-13V
                 Petitioner,         *      Special Master Sanders
v.                                   *
                                     *      Fact Hearing; Onset of Injury; Nature
SECRETARY OF HEALTH                  *      of Injury; Influenza ("Flu") Vaccine;
AND HUMAN SERVICES,                  *      Shoulder Injury Related to Vaccine
                                     *      Administration ("SIRVA")
                 Respondent.         *
* * * * * * * * * * * * * * * * * * * *
```

Shealene P. Wasserman, Muller Brazil LLP, Dresher, PA, for Petitioner.
Ann D. Martin, United States Department of Justice, Washington, DC, for Respondent.

### FACT RULING[1]

On January 4, 2017, Thomas Prestia ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et. seq.*[2] ("Vaccine Act" or "Program").  Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") in his right shoulder as a result of a flu vaccination he received on September 29, 2015.[3]  Petition, ECF No. 1.  A fact hearing was held on December 13, 2017 to determine the onset and nature of Petitioner's injury.

---

[1] Although this Fact Ruling has been formally designated "not to be published," it will nevertheless be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  In accordance with Vaccine Rule 18(b), a party has 14 days to identify and move to delete medical or other information that satisfies the criteria in § 300aa-12(d)(4)(B).  Further, consistent with the rule requirement, a motion for redaction must include a proposed redacted ruling.  If, upon review, the undersigned agrees that the identified material fits within the requirements of that provision, such material will be withheld from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99–660, 100 Stat. 3755.

[3] Respondent's Rule 4(c) Report notes that "the petition does not expressly allege" SIRVA, but acknowledges that, "in consideration of the nature of the injury at issue, it appears that petitioner is attempting to advance a SIRVA claim."  Resp't's Rept. at 6, ECF No. 15.

For the reasons set forth below, the undersigned finds that Petitioner did not suffer from any ongoing right or left shoulder injury prior to September 29, 2015.  The undersigned finds that Petitioner experienced a gradual onset of right shoulder pain and decreased range of motion that began in February of 2016.  The undersigned further finds that Petitioner's injury significantly improved in June of 2016, warranting the discontinuation of treatment.

## I.   **Procedural History**

Petitioner filed four sets of medical records and an affidavit with his petition on January 4, 2017.  Pet'r Exs. 1-5, ECF No. 1.  He filed an additional affidavit on June 1, 2017.  Pet'r Ex. 6, ECF No. 14.  The case was originally assigned to the Special Processing Unit at the Office of Special Masters.  *See* Initial Order, ECF No. 5.  On July 14, 2017, Respondent filed his Rule 4(c) Report.  Resp't's Rept., ECF No. 15.  In his report, Respondent identified concerns regarding Petitioner's history of sporadic shoulder pain before the vaccination in 2015.  *Id.* at 7.  Respondent also expressed concerns about the severity of Petitioner's injury.  *Id.* at 7-8.  A status conference was held on August 17, 2017.  *See* Minute Entry, docketed Aug. 17, 2017.  Thereafter, the case was reassigned to the undersigned on August 22, 2017.  ECF No. 17.  At a status conference held on September 7, 2017, the parties expressed interest in a fact hearing to help determine the onset and severity of Petitioner's injury.  *See* Order, ECF No. 19.  The undersigned also suggested that Petitioner file witness affidavits addressing the onset of his injury.  *Id.*  On September 26, 2017, Petitioner filed two additional affidavits, one from his wife and one from a coworker, regarding the onset of his injuries.  Pet'r Exs. 7-8, ECF No. 22.

A fact hearing was held on December 13, 2017.  Petitioner was the only witness to testify at the hearing, and he testified by video teleconference.  After the hearing, the undersigned ordered Petitioner to file records from an allergist that Petitioner identified during his testimony.  Order, ECF No. 24.  Petitioner timely filed the records on January 4, 2018.  Pet'r Ex. 9, ECF No. 27.  The undersigned also ordered Petitioner to file additional information from his treating chiropractor.  Order, ECF No. 24.  Petitioner timely filed a letter from his chiropractor on January 10, 2018.  Pet'r Ex. 10, ECF No. 28.  Based on those additional filings, the undersigned ordered that Petitioner file other documentation, which he also timely filed.  *See* Order, ECF No. 30; Pet'r Ex. 11, ECF No. 31; *see also* Order, ECF No. 32; Pet'r Exs. 12-13, ECF No. 33.  The matter is now ripe for consideration.

## II.   **Medical Records**

### A.  **Pre-Vaccination**

Petitioner regularly treated with chiropractor Donna M. Rimbey ("Dr. Rimbey")[4] in the years prior to the vaccination at issue in this case.[5]  Pet'r Ex. 3 at 1-66, 85-92.  Dr. Rimbey's visit notes each contain subjective and objective notes, an assessment in the form of diagnosis codes, a plan, and a section reflecting what treatments were performed on that date.  *See generally* Pet'r Ex. 3.

Petitioner's subjective complaints varied over the months and years prior to the vaccination at issue, but included pain in some combination of his back, neck, knees, hips, ankle, and/or shoulders.  Pet'r Ex. 3 at 1-66, 85, 89-92.  The subjective portions of the notes range from vague to detailed, and are sometimes left entirely blank.[6]  Other than a motor vehicle accident in December 2012, no major incidents are documented as causes for any of Petitioner's complaints during the pre-vaccination time period.  *Id.* at 85-88.  Where a potential cause is noted in the subjective portion of the note, Petitioner apparently attributed his pain to general activities such as golfing,[7] illness,[8] or housework.[9]

In the objective section of the pre-vaccination visit notes, Dr. Rimbey typically listed the general regions or muscles where she found tightness, spasm, dysfunction, dyskinesia,[10]

---

[4] After the fact hearing in this case, the undersigned instructed Petitioner to file a letter from Dr. Rimbey.  Order, ECF No. 24.  Petitioner filed a letter from the chiropractor dated January 2, 2018, which reflects that the chiropractor now goes by Dr. Donna M. Copertino.  Pet'r Ex. 10 at 3.

[5] The chiropractic records consist largely of one page "Visit Notes."  *See, e.g.*, Pet'r Ex. 3 at 1.  The date of each visit is clearly documented in the heading of each note.  However, there are also other dates contained within the notes that do not correspond with the visit date.  Each note includes an "[o]nset" date, and most often the "[o]nset" date is "12/11/2013," even where the visit was before that date.  *Id.*  Each note also includes a reference to "[d]iagnoses as of the examination on" a listed date, with dates as early as 2009 listed.  *Id.*  Thus, it is not clear from the records exactly when Petitioner began treating with the chiropractor.  The first visit note in the record is from September 12, 2012.  Pet'r Ex. 3 at 1.

[6] Some notes contain no information in the subjective section.  *E.g.*, *id.* at 7.  Other notes vaguely describe pain as "worse," "same," or "better."  *E.g.*, *id.* at 9.  Occasionally, notes contain a detailed descriptions of the pain, such as "frequent, intense, sharp low back pain on the left," and describe an event that triggered the pain.  *E.g.*, *id.* at 14.

[7] *E.g.*, *id.* at 2 (reporting that Petitioner was "[p]laying in golf tournament this week [and] felt [lower back pain] after walking course 2 days").

[8] *E.g.*, *id.* at 5 (noting that Petitioner "has been sick with bronchitis and coughing a[ ]lot").

[9] *E.g.*, *id.* at 26 (noting an "increase in low back pain after shoveling snow").

[10] Dyskinesia is the "distortion or impairment of voluntary movement, as in tic, spasm, or myoclonus."  *Dorland's Illustrated Medical Dictionary* 578 (32nd ed. 2012) [hereinafter "*Dorland's*"].

adhesions, and/or tension. *E.g.*, Pet'r Ex. 3 at 1-3. She also occasionally noted decreased rotation, extension, or flexion. *E.g., id.* at 16. In one note, Dr. Rimbey categorized objective findings related to "mobility" and "stability." *Id.* at 18. In another note, Dr. Rimbey documented in the objective section that she was performing a "[g]olf review." *Id.* at 22.

The diagnosis codes included by Dr. Rimbey in Petitioner's pre-vaccination notes reflect, at various times, all of the following: "739.1 Cervical segmental dysfunction," Pet'r Ex. 3 at 1-66, 89-90; "723.4 Cervical Radiculitis," *id.* at 38-48, 51-65; "847.0 Cervical hyperflexion/ hyperextension," *id.* at 85, 89-92; "739.2 Thoracic segmental dysfunction," *id.* at 1-66; "739.3 Lumbar segmental dysfunction," *id.* at 1-23, 26-66; "847.2 Lumbar hyperflexion/hyperextension," *id.* at 6-23, 41-48; "847.2 Lumbar sprain/strain" *id.* at 59-65; "739.4 Sacroiliac segmental dysfunction," *id.* at 28-48; "846.9 SI s/s," *id.* at 14-23; "719.47 Ankle pain," *id.* at 18-23; "845.00 Ankle Spr[ai]n/Strain," *id.* at 59-65; "843.9 Hip Sprain/Strain Unspec," *id.* at 1-23, 29-40, 42-65; "924.01 Hip contusion," *id.* at 85, 89-92; and "840.8 Shoul[d]er sprain/strain," *id.* at 1-8, 10-23, 31-66, 85, 89-92.

In the treatment portion of the notes, Dr. Rimbey generally listed one or more treatments, such as range of motion/flexibility exercises or myofascial[11] release. *E.g.*, Pet'r Ex. 3 at 6. The notes reflect where the treatment was administered in general terms, such as "thoracic region," "hip," or "shoulder." *E.g., id.* at 8. For treatment areas such as the shoulders, Dr. Rimbey did not usually specify whether a treatment was performed on the left side, right side, or both.

Of potential significance to the issues to be decided in this case are the visits where the notes reflect problems involving Petitioner's shoulders prior to his vaccination in September 2015. Dr. Rimbey included the diagnosis code for "shoul[d]er pain/strain" in sixty-three visit notes between September 2012 and Petitioner's vaccination in September 2015. Pet'r Ex. 3 at 1-8, 10-23, 31-66, 85, 89-92. In contrast, there were only eight documented visits during that time period where Dr. Rimbey did not diagnose shoulder strain or sprain. *Id.* at 9, 24-30. The diagnosis code does not specify whether it refers to Petitioner's right or left shoulder, or both.

The shoulder-related diagnosis code appears in each of the visit notes from September 2012 to May 15, 2013. Pet'r Ex. 3 at 1-8, 85-92. It does not appear in a visit note from June 3, 2013. *Id.* at 9. The diagnosis code then appears again in all visit notes from June 21, 2013 through January 2, 2014. *Id.* at 10-23. It does not appear in any of the notes for seven visits between January 9, 2014 and March 28, 2014. *Id.* at 24-30. Beginning on April 10, 2014 and continuing through September 17, 2015, the last visit before Petitioner's vaccination, the diagnosis code appears in every note. *Id.* at 31-66. In those visit notes where the diagnosis code appears, the subjective, objective, and treatment sections vary widely. Each visit from September 2012 to September 2015, including any subjective, objective, or treatment notes relating to Petitioner's shoulders, is discussed below.

---

[11] "Myofascial" means "pertaining to or involving the fascia surrounding and associated with the muscle tissue." *Dorland's*, at 1223. "Myofascial pain" is pain attributed to trigger points in muscles and their fascia. *Id.* at 1363.

Despite the inclusion of the shoulder-related diagnosis code, there is no specific mention of shoulder pain or any other issues involving either of Petitioner's shoulders in the subjective, objective, or treatment portions of the notes from September or November of 2012. Pet'r Ex. 3 at 1-4.

Petitioner was involved in a motor vehicle accident on December 13, 2012, and a visit note from the following day notes muscle spasms in the "left and right shoulder/pectoralis region (from seatbelt)." Pet'r Ex. 3 at 85. Treatment included active release technique and range of motion/flexibility exercises administered to a shoulder. *Id.* at 85-86. The note does not specify which shoulder received treatment. *Id.* At four visits in January 2013, Petitioner complained of neck pain with symptoms into his left arm, but there is no specific mention of shoulder pain or any other issue involving Petitioner's shoulders on those dates. Furthermore, the January 23, 2013 visit note reflects that Petitioner had achieved maximum medical improvement for injuries sustained in the motor vehicle accident. *Id.* at 89-92.

On February 6, 2013, the visit note reflects that Petitioner complained of "neck tension into [his] shoulders" due to recent illness and coughing. Pet'r Ex. 3 at 5. In the objective portion of the note, Dr. Rimbey documented dyskinesia and taut/tender fibers in various regions of the upper body, but nothing specific to either shoulder. *Id.* The note reflects that active release technique was performed on a shoulder, but the note does not specify which shoulder received treatment. *Id.*

The March 3, 2013 visit note does not reference shoulder pain or any other issue involving either of Petitioner's shoulders in the subjective, objective, or treatment sections. Pet'r Ex. 3 at 6.

On April 15, 2013, the visit note reflects no subjective findings, but objectively Dr. Rimbey noted "[s]pasm and adhesion . . . in the bilateral Scapula." Pet'r Ex. 3 at 7. The note reflects that range of motion/flexibility exercises were administered to a shoulder. *Id.* The note does not specify which shoulder received treatment. *Id.*

On May 15, 2013, the visit note reflects that Petitioner reported his shoulder pain was "better" since the last visit, and no objective findings were made regarding either shoulder. Pet'r Ex. 3 at 8. In the treatment section, it is documented that range of motion/flexibility exercises and myofascial release were administered to a shoulder. *Id.* The note does not specify which shoulder received treatment. *Id.*

The next visit note, from June 3, 2013, does not include the shoulder sprain/strain diagnosis code. Pet'r Ex. 3 at 9. At the visit on June 21, 2013, however, Petitioner subjectively reported "Shoulder Pain; same;" Dr. Rimbey noted tightness in the left posterior shoulder; the shoulder sprain/strain diagnosis code reappeared; and both range of motion/flexibility exercises and myofascial release were administered to the shoulder.[12] Pet'r Ex. 3 at 10. The shoulder sprain/strain diagnosis code then continues to appear in the notes through the January 2, 2014 visit. *Id.* at 10-23.

---

[12] In notes where Dr. Rimbey made reference to only one shoulder in the subjective and/or objective sections and documented that a treatment was administered to an unspecified "shoulder," the undersigned assumes that the treatment was administered to the referenced shoulder.

On August 2, 2013, the visit note reflects subjectively that shoulder pain was the "same" and objectively that there was "decreased rotation" in the right scapula. Pet'r Ex. 3 at 11. Range of motion/flexibility exercises and myofascial release were administered to the shoulder. On August 5, 2013, the visit note reflects that Petitioner subjectively felt that the shoulder pain was "better." *Id.* at 12. There are no objective or treatment notes related to either shoulder, despite the continued use of the shoulder sprain/strain diagnosis code. *Id.* On August 29, 2013, the visit note again reflects that Petitioner's subjective shoulder pain was "better." *Id.* at 13. Objectively, Dr. Rimbey noted left posterior shoulder tension and treatment included range of motion/flexibility exercises and myofascial release administered to the shoulder. *Id.*

On September 24, 2013 and September 26, 2013, shoulder pain is reported as subjectively the "same." Pet'r Ex. 3 at 14-15. No objective findings were made related to either of Petitioner's shoulders, and no relevant treatments are reflected. *Id.*

On October 3, 2013, the visit note reflects that Petitioner's shoulder pain was subjectively "better," and there are no objective findings or treatments relating to either shoulder listed. Pet'r Ex. 3 at 16.

On November 7, 2013 and November 22, 2013, there are no subjective, objective, or treatment notes related to Petitioner's shoulders, although the diagnosis code remains in the notes. Pet'r Ex. 3 at 17-18. On November 27, 2013, shoulder pain is listed as subjectively the "same." *Id.* at 19. Dr. Rimbey's objective notes do not precisely reflect a problem or complaint, but she noted: "Left scapula and retractor with rotation left and right of thoracic spine." *Id.* Range of motion/flexibility exercises and myofascial release were administered to a shoulder, although the note does not specify which shoulder received treatment. *Id.*

On December 5, 2013, there are no subjective notes about shoulder pain in the visit note. Pet'r Ex. 3 at 20. Objectively, Dr. Rimbey noted the following: "[d]ecreased external rotation left hip/pelvis/trunk/scapula/hume[r]us. Decreased supination. #1 Decreased left rotation of thoracic spine[;] #2 scapula." *Id.* No treatments are noted, but cervical, thoracic, and lumbar region exercises were advised. *Id.* On December 11, 2013, shoulder pain is listed as "same" and Dr. Rimbey noted "[l]eft posterior shoulder tension @ [the glenohumeral joint ("GH")] with horizontal adduction." *Id.* at 21. Range of motion/flexibility exercises and myofascial release were administered to the shoulder. *Id.* On December 26, 2013, there are no subjective shoulder complaints, and Dr. Rimbey documented that she was performing a "[g]olf review." *Id.* at 22. The objective portion of the note reflects that Petitioner "[n]eeds to increase scapula moti[o]n in horizontal abduction and increase inf[erior] glide GH joint." *Id.* No treatment to either of Petitioner's shoulders is reflected on that date. *Id.*

On January 2, 2014, the visit note reflects that petitioner reported that his shoulder pain was the "same," but there are no objective or treatment notes relating to his shoulders. Pet'r Ex. 3 at 23. At the next seven visits, which occurred in January through March of 2014, the shoulder sprain/strain diagnosis code was not included in the visit notes. *Id.* at 24-30. There were no subjective, objective, or treatment notes regarding Petitioner's shoulders in any of those notes. *Id.*

The shoulder sprain/strain diagnosis code reappears for every visit from April 10, 2014 through September 17, 2015. Pet'r Ex. 3 at 31-66. On April 10, 2014, the visit note does not contain subjective or objective notes about Petitioner's shoulders. *Id.* at 31. However, the treatment section reflects that range of motion/flexibility exercises and myofascial release were administered to a shoulder. *Id.* The note does not indicate which shoulder was treated. *Id.* On April 17, 2014, there are no subjective notes about Petitioner's shoulder. *Id.* at 32. Objectively, Dr. Rimbey noted "right post[erior] scapula tension," and range of motion/flexibility exercises and myofascial release were administered to the shoulder. *Id.*

On May 7, 2014, the subjective portion of the visit note does not reflect any shoulder pain, but the objective portion of the note reflects that Petitioner had "right post[erior] scapula tension. Pet'r Ex. 3 at 33. Range of motion/flexibility exercises and myofascial release were administered to the shoulder. *Id.* On May 16, 2014, there are no subjective, objective, or treatment notes related to Petitioner's shoulders. *Id.* at 34. On May 28, 2014, although there are no subjective notes relating to Petitioner's shoulders, the objective portion of the note reflects that Dr. Rimbey observed "tight . . . left scapular ROTC muscles." *Id.* at 35. She treated Petitioner's shoulder with range of motion/flexibility exercises and myofascial release. *Id.*

On June 18, 2014, Dr. Rimbey again noted "tight . . . left scapular ROTC muscles" and treated Petitioner's shoulder with range of motion/flexibility exercises and myofascial release. Pet'r Ex. 3 at 36. These treatments were administered despite no documentation of a subjective complaint. *Id.* A visit note from the next day, June 19, 2014, reflects a subjective complaint of "increased neck and right shoulder blade pain." *Id.* at 37. The objective and treatment portions of that note do not reference Petitioner's shoulders. *Id.* Instead, Dr. Rimbey's objective documentation is "1st rib superior subluxation limited right rotation." *Id.* In the next visit note, from June 30, 2014, there are no subjective or treatment notes relating to Petitioner's shoulders. *Id.* at 38. However, Dr. Rimbey noted an objective "[u]lnar nerve entrapment at su[b]scapularis – decreased right rotation cervical spine." *Id.*

Three days later, on July 3, 2014, Petitioner saw Dr. Rimbey again. Pet'r Ex. 3 at 39. There are no subjective notes regarding Petitioner's shoulder in the note from that date. *Id.* In the objective portion of the note, Dr. Rimbey documented "[r]ight thoracic spine and shoulder adduction," and the treatment section reflects that range of motion/flexibility exercises and myofascial release were administered to the shoulder. *Id.* On July 14, 2014 and July 17, 2014, the visit notes reflect no subjective, objective, or treatment notes relating to Petitioner's shoulders, despite the continued inclusion of the shoulder sprain/strain diagnosis code. *Id.* at 40-41.

On August 22, 2014, Dr. Rimbey noted a "[r]ight lower scapula spasm," but there is no subjective complaint in the visit note. Pet'r Ex. 3 at 42. Likewise, there is no indication that Dr. Rimbey treated either of Petitioner's shoulders at that visit. *Id.*

On September 12, 2014 and September 19, 2014, the visit notes reflect no subjective, objective, or treatment notes relating to Petitioner's shoulders, but the shoulder sprain/strain diagnosis code remains in the note. Pet'r Ex. 3 at 43. On September 25, 2014, there is no subjective complaint regarding either shoulder, but the objective portion of the note reflects "[l]eft scapula decreased R[ange] O[f] M[otion] in backswing of golf." *Id.* at 45. Range of

motion/flexibility exercises and myofascial release were administered to the shoulder at that visit. *Id.*

On October 17, 2014, there are no subjective, objective, or treatment notes relating to Petitioner's shoulders.  Pet'r Ex. 3 at 46.  On October 22, 2014, Petitioner reported that his shoulder pain was "worse," and Dr. Rimbey's objective note reflects "[l]eft scapula anterior tilt with pectoral spasm."  *Id.* at 47.  The note reflects that Petitioner's shoulder was treated with range of motion/flexibility exercises and myofascial release.  *Id.*  On October 28, 2014, Petitioner rated his shoulder pain as "better" and there are no objective or treatment notes relating to his shoulders. *Id.* at 48.

On November 13, 2014, Petitioner's shoulder pain is listed as the "same," and the objective portion of the note states "[r]ight post[erior] shoulder capsule tight limiting adduction."  Pet'r Ex. 3 at 49.  Range of motion/flexibility exercises and myofascial release were administered to the shoulder.  *Id.*

The December 8, 2014 note reflects that Petitioner's shoulder pain was the "same," but there is no objective finding regarding the shoulder, and no treatment of the shoulder is reflected. Pet'r Ex. 3 at 50.

On January 2, 2015, Petitioner rated his shoulder pain as "worse," and Dr. Rimbey noted objectively a "[l]eft rhomboid, levator[,] and subscapularis spasm."  Pet'r Ex. 3 at 51.  Range of motion/flexibility exercises and myofascial release were administered to the shoulder.  *Id.*  On January 26, 2015, shoulder pain remained subjectively the "same," and Dr. Rimbey noted "[l]eft scapular elevation with spasm."  Pet'r Ex. 3 at 52.  Range of motion/flexibility exercises and myofascial release were administered to the shoulder.  *Id.*

At the February 19, 2015 visit, shoulder pain remained subjectively the "same."  Pet'r Ex. 3 at 53.  In the objective portion of the note, Dr. Rimbey documented "infraspinatus and bicep spasm/tension."  *Id.*  Range of motion/flexibility exercises and myofascial release were administered to a shoulder, but the note does not specify which shoulder received treatment.  *Id.*

In the March 2, 2015 note, shoulder pain is subjectively listed as "better."  Pet'r Ex. 3 at 54.  The objective portion of the note includes a finding of tension in the pectoral, infraspinatus, and bicep on an unspecified side, but no shoulder treatments are listed.  *Id.*  On March 19, 2015, shoulder pain is listed as subjectively the "same," but the subjective portion of the note also reflects that Petitioner "report[ed] left arm over head motion decreased with scapula restriction."  *Id.* at 55.  Objectively, Dr. Rimbey documented a "[l]eft pectoral, serratus anterior and subscap[ularis] spasm limiting posterior scapular glide."  *Id.*  Range of motion/flexibility exercises and myofascial release were administered to the shoulder.  *Id.*

On April 16, 2015, shoulder pain is again listed as subjectively the "same."  Pet'r Ex. 3 at 56.  Dr. Rimbey noted a "[b]ilateral levator spasm with tight posterior shoulder."  *Id.*  Range of motion/flexibility exercises and myofascial release were administered to a shoulder, although the note does not specify which shoulder received treatment.  *Id.*  On April 23, 2015, shoulder pain was still listed as the "same," but objectively Dr. Rimbey noted "[a]dhesions . . . in the left

Ser[ratus] Pos[terior] Sup[erior muscle], left Rhomboid, left Lev[ator] Scap[ulae] and left Sapinal [sic] Acces [sic]." *Id.* at 57.  No treatment to a shoulder is reflected in the note.  *Id.*

In the May 15, 2015 note, shoulder pain is again listed as the "same."  Pet'r Ex. 3 at 58. Objective notes include: "tight shoulder R>L. posterior GH joint."  *Id.*  Range of motion/flexibility exercises and myofascial release were administered to a shoulder, although it is not specified which shoulder received treatment.  *Id.*

On June 8, 2015, shoulder pain is listed as the "same."  Pet'r Ex. 3 at 59.  Dr. Rimbey specifically documented that Petitioner "entered the office with a new condition."  *Id.*  She noted that Petitioner was "complaining of left ankle and low back pain" at this visit because he "fell into a sink hole in his yard."  *Id.*  The objective and treatment portions of the note do not reference Petitioner's shoulders.  *Id.*  On June 12, 2015, shoulder pain is still the "same," and again, there are no objective or treatment notes referencing Petitioner's shoulders.  *Id.* at 60.

On July 3, 2015, Petitioner again rated his shoulder pain as the "same."  Pet'r Ex. 3 at 61. A note in the objective section references the left scapula, although a specific problem is not detailed.  *Id.*  Range of motion/flexibility exercises and myofascial release were administered to the shoulder.  *Id.*  On July 30, 2015, shoulder pain is listed as subjectively "better," but the same reference to the left scapula appears in the objective section.  *Id.* at 62.  Range of motion/flexibility exercises and myofascial release were again administered to the shoulder.  *Id.*

At the August 7, 2015 visit, shoulder pain is listed as subjectively the "same."  Pet'r Ex. 3 at 62.  Dr. Rimbey noted "left serratus post sup" in the objective portion of the note, but did not specify a particular issue.  *Id.*  Range of motion/flexibility exercises and myofascial release were administered to the shoulder.  *Id.*  On August 17, 2015 and September 11, 2015, shoulder pain was subjectively the "same."  *Id.* at 64-65.  Dr. Rimbey noted "C6/7 left referred pain to [the] left par[a]scapular area" on both dates.  *Id.*  No treatment was administered to Petitioner's shoulders at either visit.  *Id.*  On September 17, 2015, shoulder pain is rated as "better," and there are no objective or treatment notes relating to Petitioner's shoulders.  *Id.* at 66.

In addition to his regular visits with Dr. Rimbey, Petitioner's pre-vaccination medical records reflect that Petitioner had regular appointments at Allergy Partners of the Lehigh Valley, where he received numerous allergy injections approximately every few weeks.  *See* Pet'r Ex. 9 at 118-183; Pet'r Ex. 13 at 1, 5-10.  The allergist's records noted the number of injections received per visit and where each injection was received on the body.  *See generally* Pet'r Ex. 9.  Petitioner regularly received injections in the "upper," "mid," and "lower" sections of both arms.  *Id.* Records reflect that Petitioner also received flu vaccinations at his allergist's office on October 11, 2006, October 22, 2010, and October 23, 2014.  Pet'r Ex. 13 at 3.  The last visit with his allergist before receiving the flu vaccine at issue in this case was on September 24, 2015.  *Id.* at 118-23. On that date, he received five injections and a refill for a medication that he took regularly was sent to a Target Pharmacy.  *Id.*

Petitioner also visited primary care physicians at George M. Joseph & Associates four times in 2013, once in 2014, and twice in 2015.  He saw Dr. Mark H. Auerbach and Dr. Pramila P. Gupta at that practice.  Two of the visits appeared to be routine appointments related to

hyperlipidemia, asthma, and GERD. Pet'r Ex. 4 at 35-37, 79. On three occasions, Petitioner had mild to moderate complaints, including cough symptoms triggered by choking on ice, a rash caused by poison ivy, and a bug bite. *Id.* at 37-40, 42-45, 76-78. Significantly, on two occasions Petitioner visited Dr. Gupta at the practice with pain complaints. On December 2, 2013, he presented with pain in his right hand that lasted for four days after playing golf. *Id.* at 32-34. On March 5, 2014, Petitioner reported back pain on his right side which began after bending at work four days prior. *Id.* at 30-32. Petitioner's medical records from the practice also include the results of pulmonary tests, chest and sinus radiology results, an upper endoscopy procedure, and various blood lab tests from 2013 and 2015. *Id.* at 46-71, 80-85.

## B. Vaccination

On Tuesday, September 29, 2015, Petitioner received the quadrivalent influenza vaccination in his right deltoid from a pharmacist at a Target Pharmacy. Pet'r Ex. 1.

## C. Post-Vaccination

Two days after receiving the flu vaccine, on October 1, 2015, Petitioner was seen by his chiropractor, Dr. Rimbey. Pet'r Ex. 3 at 67. In the subjective portion of the visit note from that date, Dr. Rimbey documented that Petitioner reported neck pain, low back pain, mid back pain, and hip pain as the "same." *Id.* Objectively, she noted "spasm mid belly left hamstring." *Id.* Petitioner's cervical and thoracic segments were adjusted, and range of motion/flexibility exercises and myofascial release were administered to Petitioner's hip. *Id.* Although the note contains no subjective, objective, or treatment notes relating to either of Petitioner's shoulders, the assessment portion of the note contains a new diagnosis code, "S43.401A Unspecified sprain of right shoulder joint, init encntr." *Id.* The 840.8 diagnosis code seen in previous notes for shoulder sprain/strain no longer appears in the note. *Id.* Under the plan portion of the note, Dr. Rimbey wrote "[s]ee again as needed." *Id.*

On October 9, 2015, Petitioner cancelled a scheduled appointment with his allergist because he "[w]as called to work." Pet'r Ex. 9 at 117-18. At an appointment with the allergist's office on October 15, 2015, he received five injections. *Id.* at 116-17. Two of the injections were administered in his right arm: one noted as "Rt Arm Upper" and the other as "Rt Arm Mid." *Id.* at 116-17. The other three injections were administered in Petitioner's left arm. *Id.* There were no reactions noted, and there are no comments about the visit generally. *Id.*

The same day, October 15, 2015, Petitioner was again seen at the chiropractor's office, this time by Michael Travis, D.C. Pet'r Ex. 3 at 68. In the subjective portion of the visit note, shoulder pain is listed and rated as the "same," and Dr. Travis documented that Petitioner stated that "he hurt his hamstring gardening." *Id.* Objective findings relating to the left hamstring and leg are documented, and the left leg and pelvis were treated. *Id.* There are no objective or treatment findings related to Petitioner's shoulders. *Id.* The assessment portion of the note contains the same diagnosis codes that were in the previous note, including the S43.401A diagnosis code. *Id.* Under the plan portion of the note, the chiropractor wrote "[c]ontinue as planned." *Id.*

Two weeks after the previous chiropractic visit and one month after he received the flu vaccine, on October 29, 2015, Petitioner was again seen by Dr. Rimbey. Pet'r Ex. 3 at 69. All of the same diagnosis codes appear in the assessment portion of the note, including the S43.401A code. *Id.* However, the subjective, objective, and treatment portions of the note only reference Petitioner's left leg. *Id.* Under the plan portion of the note, Dr. Rimbey wrote "[s]ee again as needed." *Id.*

On November 4, 2015, Petitioner again received five allergy injections. Pet'r Ex. 9 at 114-16. At this visit, three of the injections were administered in his right arm. *Id.* at 115. No reactions were noted, and there are no general notes about the visit. *Id.* There are notes in the allergist's records dated November 6, 2015 that relate to extract formulation, but it unclear whether Petitioner was seen on that date. *Id.* at 111-14. On November 11, 2015, the allergist's notes reflect that Petitioner received three allergy injections. *Id.* at 111. Injections were administered to Petitioner's lower and mid right arm, and the note does not specify where the third injection was administered. *Id.* There are no comments contained in the note. *Id.* On November 23, 2015, the allergist's notes reflect that Petitioner received three injections. *Id.* at 109-10. The injections were administered to Petitioner's right upper arm, right lower arm, and left upper arm. *Id.* at 110. There are no comments contained in the note regarding the visit, and no reactions were documented. *Id.* On November 30, 2015, Petitioner again received five allergy injections. *Id.* at 108-09. The injections were administered to Petitioner's right upper arm, right lower arm, left upper arm, left middle arm, and left lower arm. *Id.* No reactions are noted, and there are no comments about the visit. *Id.*

More than one month after his previous chiropractic visit, on December 9, 2015, Petitioner again saw Dr. Rimbey. Pet'r Ex. 3 at 70. All of the same diagnosis codes from the prior visit appear in the assessment portion of the note, including the S43.401A code. *Id.* There is again no reference to either of Petitioner's shoulders in the subjective, objective, or treatment portions of the note. *Id.* Under the plan portion of the note, Dr. Rimbey wrote "[c]ontinue as planned." *Id.*

Petitioner received five allergy injections on December 10, 2015. Pet'r Ex. 9 at 106-08. The injections were administered to Petitioner's right upper arm, right lower arm, left upper arm, left middle arm, and left lower arm. *Id.* at 107. There is a note regarding extract management dated December 22, 2015, but it does not appear that Petitioner received injections on that date. *Id.* at 105-06. Petitioner received four injections on December 28, 2015. *Id.* at 104-05. Two injection sites were in his right arm, at upper and lower injection sites. *Id.* at 104. There are no comments contained in any of the December notes, and no reactions are noted. *Id.* at 104-08.

Petitioner next saw Dr. Rimbey one month after the previous chiropractic visit, on January 11, 2016. Pet'r Ex. 3 at 71. All of the same diagnosis codes appear in the assessment portion of the note, including the S43.401A code. *Id.* Petitioner reported that his neck pain, low back pain, mid back pain, and hip pain were the "same," and there are no subjective notes related to either of Petitioner's shoulders. *Id.* In the objective portion of the note, Dr. Rimbey wrote: "Right piriformis and g[e]mellus, right deltoid, left T1 decreased lateral bend." *Id.* Dr. Rimbey documented in the treatment section that she adjusted Petitioner's thoracic region and that range of motion/flexibility exercises and myofascial release were administered to "hip, shoulder" for 30 minutes. *Id.* The note does not specify which shoulder received treatment. *Id.* Under the plan portion of the note, Dr. Rimbey wrote "[s]ee again as needed." *Id.*

11

On January 14, 2016, Petitioner received three allergy injections. Pet'r Ex. 9 at 102-03. Two of the shots were administered to his right arm, at upper and lower injection sites. *Id.* at 103. The notes reflect no reaction at the time of injection, and there are no comments about the visit. *Id.*

Two weeks after the previous chiropractic appointment, Petitioner saw Dr. Rimbey again on January 25, 2016. Pet'r Ex. 3 at 72. All of the same diagnosis codes appear in the assessment portion of the note from that date, including the S43.401A code. *Id.* At that visit, Petitioner reported that his neck and mid back pain were the "same," while his low back and hip pain were "worse." *Id.* Dr. Rimbey documented bilateral psoas muscle spasm and decreased lumbar extension and rotation, and treated Petitioner's lumbar spine and hip. *Id.* There are no references to Petitioner's shoulders in the note, other than the diagnosis code. *Id.* Under the plan portion of the note, Dr. Rimbey wrote "[s]ee again as needed." *Id.*

On February 3, 2016, Petitioner received five allergy injections. Pet'r Ex. 9 at 101-02. He received two of the injections in his right arm, with upper and lower injection sites. *Id.* at 101. The notes reflect no reaction at the time of injection, and there are no comments about the visit. *Id.*

Two weeks after the previous chiropractic appointment, Petitioner saw Dr. Rimbey again on February 8, 2016. Pet'r Ex. 3 at 73. All of the same diagnosis codes appear in the assessment portion of the note from that date, including the S43.401A code. *Id.* At this visit, Petitioner reported that his neck, back, and hip pain were the "same," and shoulder pain is described as "worse." *Id.* In the objective portion of the note, Dr. Rimbey found issues with Petitioner's thoracic spine and she also documented "[j]oint mobility dysfunction and tissue extensibility dysfunction in the right shoulder." *Id.* Range of motion/flexibility exercises were administered to the shoulder. *Id.* Under the plan portion of the note, Dr. Rimbey wrote "[s]ee patient again in one week." *Id.*

The following week, on February 16, 2016, Petitioner again presented to Dr. Rimbey. Pet'r Ex. 3 at 74. All of the same diagnosis codes appear in the assessment portion of the note from that date, including the S43.401A code. *Id.* The only subjective complaint documented is shoulder pain, which is rated as "same." *Id.* In the objective portion of the note, Dr. Rimbey wrote: "Right scapular Segmental motion control dysfunction – ground get up step 3. TRX splits over head." *Id.* Range of motion/flexibility exercises were administered to the shoulder for 30 minutes, and shoulder exercises were advised for 30 minutes. *Id.* Under the plan portion of the note, Dr. Rimbey wrote "[s]ee again as needed." *Id.*

On February 25, 2016, Petitioner received five allergy injections. Pet'r Ex. 9 at 99-101. Two injections were administered to his right arm, with upper and lower injection sites. *Id.* No adverse reactions are noted, and there are no comments from the visit. *Id.*

Just under three weeks after his previous chiropractic visit, on March 7, 2016, Petitioner saw Dr. Rimbey again. Pet'r Ex. 3 at 75. All of the same diagnosis codes appear in the assessment portion of the note from that date, including the S43.401A code. *Id.* In the subjective portion of

the note, neck, low back, mid back, and hip pain are listed and rated as "better," while shoulder pain is listed as "same." *Id.* In the objective portion of the note, Dr. Rimbey wrote: "Pain in right lateral arm after flu shot. [P]ossible bursa inflamed with surrounding spasm." *Id.* The note specifies that range of motion/flexibility exercises and myofascial release were administered to the "right arm"[13] for 30 minutes. *Id.* In the plan portion of the note, Dr. Rimbey wrote, "[c]ontinue as planned." *Id.*

Later the same week, on March 11, 2016, Petitioner saw Dr. Rimbey again. Pet'r Ex. 3 at 76. All of the same diagnosis codes appear in the assessment portion of the note from that date, including the S43.401A code. *Id.* Neck, shoulder, low back, mid back, and hip pain are listed as subjectively the "same." *Id.* In the objective portion of the note, Dr. Rimbey documented that "[p]ain continues in [the] right shoulder." *Id.* Range of motion/flexibility exercises, myofascial release, and electrical muscle stimulation were administered to the "right shoulder." *Id.* In the plan portion of the note, Dr. Rimbey wrote, "[c]ontinue as planned." *Id.*

Four days later, on March 15, 2016, Petitioner saw Dr. Rimbey again. Pet'r Ex. 3 at 77. All of the same diagnosis codes appear in the assessment portion of the note from that date, including the S43.401A code. *Id.* Neck, shoulder, low back, mid back, and hip pain are listed as subjectively the "same." *Id.* Objectively, Dr. Rimbey noted "Right Post[erior] shoulder adhesions." *Id.* Range of motion/flexibility exercises and electrical muscle stimulation were administered. *Id.* In this note, Dr. Rimbey specified that electrical muscle stimulation was performed "on the right shoulder," while she wrote that range of motion/flexibility exercises were administered "to shoulder." *Id.* Therefore, it is unclear whether Petitioner also received treatment to his left shoulder at this visit. *Id.* In the plan portion of the note, Dr. Rimbey again wrote, "[c]ontinue as planned." *Id.*

On March 16, 2016, Petitioner received three allergy injections. Pet'r Ex. 9 at 98-99. One injection was received in Petitioner's upper right arm, one was received in his lower right arm, and the third was received in his left arm. *Id.* No reactions were noted, and there are no comments noted on this date. *Id.*

The next week, on March 21, 2016, Petitioner again presented to Dr. Rimbey. Pet'r Ex. 3 at 78. All of the same diagnosis codes appear in the assessment portion of the note from that date, including the S43.401A code. *Id.* Neck, shoulder, low back, mid back, and hip pain are listed as subjectively the "same." *Id.* In the objective portion of the note, Dr. Rimbey documented the following: "Right subscapularis and Serratus Anterior spasm. + Supraspinatus imping[e]ment >90 deg[rees] due to poor scapular stabilization." *Id.* Range of motion/flexibility exercises were "administered to shoulder," and electrical muscle stimulation was "performed on the right shoulder." *Id.* The plan was to "[c]ontinue as planned." *Id.* In this note, there is also a "comments" section, which lists a "Home Exercise Plan" of "motor control using 8lbs – bench press with cross body rotational punch." *Id.*

---

[13] This is the first note in which Dr. Rimbey specifically identifies that treatments are being administered on the right side.

Two days later, on March 23, 2016, Petitioner presented to his primary care provider, Dr. Auerbach, complaining of right shoulder pain. Pet'r Ex. 4 at 10-13. The records reflect that this was Petitioner's first visit to the primary care office since his visit on August 3, 2015 for a bug bite. *Id.* at 76-78. At the visit, Dr. Auerbach documented Petitioner's description of the history of his complaint as follows:

> CC right shoulder flu shot 9/29/2016 [sic] shot given high up in shoulder area persistent pain since 9/30/2015[.] Saw chiro since early 1/2015 [sic] for this problem. Manipulation and rom and pt rx also US rx and electronic stimulus[.] Felt better but still had pain with dec'd rom not [sic] rom only occurs with maximal rom[.] C/o stabbing pain with widened rom in multiple directions has difficulty sleeping on right side secondary to pain[.] Not using meds to relieve pain[.]

*Id.* at 10. On examination, Dr. Auerbach noted palpable pain and "[r]estricted r[ange] o[f] m[otion] with precipitation of pain in all directions." *Id.* at 11. Dr. Auerbach assessed Petitioner's condition as "chronic right shoulder pain," with the comment that the diagnosis was "due to flu vaccination 9/29/2015 with persistent discomfort and loss of r[ange] o[f] m[otion]." *Id.* He ordered x-rays and referred Petitioner to orthopedics. *Id.*

A week later, Petitioner saw Dr. Rimbey again on March 30, 2016. Pet'r Ex. 3 at 79. Petitioner rated neck, low back, mid back, and hip pain as "better," but he relayed that shoulder pain was the "same." *Id.* The subjective portion of the note also states that he had "[r]ight shoulder pain with abduction." *Id.* All of the same diagnosis codes that have appeared since October 2015, including the S43.401A code, remain in the note. *Id.* The objective portion of the note reflects "[p]ositive supraspinatus impingement with spasm and adhesions on muscle belly." *Id.* Range of motion/flexibility exercises and myofascial release were administered, specifically to the right shoulder, and Dr. Rimbey documented that she would "[c]ontinue as planned." *Id.*

The next week, on April 5, 2016, Petitioner presented to orthopedist Dr. James Reid. Pet'r Ex. 5 at 11-12. The note reflects that Petitioner was presenting for an initial visit with a complaint of right shoulder pain. *Id.* at 12. Petitioner reported "having acute onset right shoulder pain after receiving a flu shot in [S]ept[ember] 2015." *Id.* Dr. Reid noted that Petitioner "continues to have pain in the shoulder worse with certain motions," and that Petitioner "feels he has lost some motion." *Id.* Dr. Reid documented that he reviewed Petitioner's x-rays, which showed no fractures or dislocations. *Id.* Upon examination, Dr. Reid noted AC joint tenderness, bicipital groove tenderness, and deltoid tenderness. *Id.* He also noted "pain with flexion, active abduction of 120 degrees[,] and pain with abduction, but full range of motion 5/5 motor strength in all directions, no anterior joint laxity and no joint posterior laxity." *Id.* Dr. Reid found "a positive impingement sign of the right shoulder[, but] no joint instability of the right shoulder." *Id.* Dr. Reid diagnosed shoulder impingement and ordered an MRI. *Id.*

Two days later, on April 7, 2016, Petitioner saw Dr. Rimbey again. Pet'r Ex. 3 at 80. Petitioner reported his shoulder and neck pain as the "same," and advised that he was "going for an MRI of his right shoulder due to constant ache and pain with reaching behind his back." *Id.* Dr. Rimbey noted that Petitioner was "[t]ender at [s]upr[a]spinatus insertion," and all of the same diagnosis codes appear in the note. *Id.* Range of motion/flexibility exercises, myofascial release, electrical muscle stimulation, and ultrasound were administered. *Id.* Each treatment was

14

specifically documented as having been administered to the right shoulder.  *Id.*  Dr. Rimbey documented that treatment would "[c]ontinue as planned."  *Id.*

Petitioner also received three allergy injections on April 7, 2016.  Pet'r Ex. 9 at 97-98.  He received one injection in the right upper arm and one injection in the right lower arm.  *Id.* at 97.  No reactions were noted, and there are no comments documented at the visit.  *Id.* at 97-98.

The next day, April 8, 2016, an MRI of Petitioner's right shoulder was completed.  Pet'r Ex. 5 at 28-30.  The MRI report reflects a history of right shoulder pain, with "symptoms of pain following a flu vaccine injection on 9/29."  *Id.* at 28.  It also reflects that Petitioner "reported pain on the outer area of the shoulder."  *Id.*  Detailed findings are noted, and the impression included all of the following:

(1) Mild/moderate tendinopathy of the supraspinatus tendon.  Ill-defined complex signal intensity most pronounced along the bursal surface fibers, equivocal for minimal fraying.  No full-thickness tear, tendon retraction or muscle atrophy.
(2) Moderate tendinopathy of the infraspinatus tendon.  Minimal areas of intrasubstance complex signal intensity at the distal fibers.
(3) Moderate to marked thickening of the subscapularis tendon.  Areas of intrasubstance complex signal intensity approximating the biceps tendon groove, equivocal for mild intrasubstance delamination.
(4) Moderate tendinopathy of the intra-articular long head biceps tendon, with areas of complex signal intensity, contiguous with the biceps tendon groove.
(5) Extensive tears of the labrum, extending from the 8:30 position to approximately the 1:30 position.
    (A) High signal intensity within the superior labrum, extending from the posterior superior to the posterior inferior quadrant, in keeping with a SLAP component of degeneration/fraying and probable tears.
    (B) Tears are noted at the posterior mid to posterior superior labrum on the axial images (series 2 image 11 through 8).
(6) Minimal glenohumeral osteoarthritis, with minimal periarticular osteophytes and mild subchondral edema.  Small glenohumeral joint effusion.
(7) Extensive thickening of the inferior joint capsule, involving both the anterior and posterior bands of the inferior glenohumeral ligament.  Extensive complex signal intensity and soft tissue swelling surrounding the labroligamentous complex. Fluid and synovitis are noted within the rotator interval.  These findings are nonspecific, and may be seen in the clinical setting of adhesive capsulitis.
(8) Moderate osteoarthritis of the acromioclavicular joint.

*Id.* at 29-30.

Early the next week, on April 12, 2016, Petitioner had an appointment with Dr. Reid to review the MRI results.  Pet'r Ex. 5 at 7-10.  Dr. Reid assessed shoulder impingement, rotator cuff tendonitis, and a labral tear of the shoulder.  *Id.* at 9.  After discussing treatment options with

Petitioner, Dr. Reid injected the right subacromial bursa with 1ml of Depo-Medrol 40mg/ml[14] and a local anesthetic.  *Id.*  In the plan portion of Dr. Reid's note, he documented a labral tear and instructed Petitioner to bear weight as tolerated and follow up in one month.  *Id.*  The note also reflects that Petitioner was given shoulder exercises.  *Id.*

Petitioner received four allergy injections on April 28, 2016.  Pet'r Ex. 9 at 95-97.  One injection was in his right lower arm, and one injection was in his right upper arm.  *Id.* at 96.  There are no reactions noted, and there are no comments regarding the visit.  *Id.* at 95-97.

Petitioner also visited Dr. Rimbey on three occasions in the month following his visit with Dr. Reid, on April 28, 2016, May 2, 2016, and May 6, 2016.  Pet'r Ex. 3 at 81-83.  At each visit with Dr. Rimbey, Petitioner reported that his shoulder pain was the "same," and all of the same diagnosis codes appeared as in the previous visits since October 2015.  *Id.*  On April 28, 2016 and May 2, 2016, Dr. Rimbey noted spasm and adhesions in "the shoulder," although she did not specify whether the right or left shoulder was affected.  *Id.* at 81-82.  On May 6, 2016, she noted "R>L upper trap and levator tension. ROTC imbalance right side. Weak scapular stabilizers."  *Id.* at 83.  At all three visits, range of motion/flexibility exercises and myofascial release were administered to a shoulder, although the notes do not specify which shoulder received treatment. *Id.* at 81-83.

Petitioner then returned to Dr. Reid's office on May 10, 2016 and reported that the injection that Dr. Reid had administered at the prior visit provided moderate relief.  Pet'r Ex. 5 at 4-6. Petitioner was referred to physical therapy for rotator cuff tendonitis.  *Id.* at 5-6.  Relating to shoulder impingement, Petitioner was instructed to do home exercises provided at physical therapy and ice the area several times per day.  *Id.* at 5.

Petitioner also received three allergy injections on May 10, 2016, of which two were injected into his right arm, at upper and lower injection sites.  Pet'r Ex. 9 at 94-95.  There are no reactions noted, and there are no comments about the visit.  *Id.*  On May 12, 2016, the allergist's records reflect that Petitioner requested a refill on an inhaler prescription, and a note from the provider reflects that Petitioner missed his previous two appointments and needed to be seen.  Pet'r Ex. 9 at 93-94.  Although a note reflects that the prescription was filled on May 13, 2016, another note from May 20, 2016 reflects that Petitioner had still not made an appointment to be seen by the provider and again requested the refill.  *Id.* at 93.

Petitioner presented to Dr. Rimbey on May 13, 2016.  Pet'r Ex. 3 at 84.  She documented that Petitioner's shoulder pain was the "same" and listed all of the same diagnosis codes that had been listed since October 2015.  At this visit, Dr. Rimbey documented "[s]ubscap and lat [d]orsi adhesions."  *Id.*  She administered range of motion/flexibility exercises and myofascial release to a shoulder, and noted that the plan was to "[s]ee [Petitioner] again as needed."  *Id.*  The note does not specify which shoulder received treatment.  *Id.*

---

[14] "Depo-Medrol is an anti-inflammatory glucocorticoid for intramuscular, intra-articular, soft tissue, or intralesional injection."  Pfizer Injectables, *Depo-Medrol Label* (2016), https://www. accessdata.fda.gov/drugsatfda_docs/label/2016/011757s104lbl.pdf.

Petitioner began physical therapy on May 17, 2016.  Pet'r Ex. 5 at 21-27.  During his initial evaluation, Petitioner reported pain at a level of 0/10 at rest, which went up to 5/10 with activity and was dull and localized.  *Id.* at 21.  The physical therapist documented that Petitioner "got a flu shot in September 2015 and states the shot was put too high and into his bursa of his shoulder.  He is having pain in the front of his right shoulder.  He has pain with quick movements and reaching.  He had a cortisone shot which helped a little."  *Id.*  Petitioner reported that his "shoulder hurts when [he] reach[es]."  *Id.* at 23.  After the evaluation, the physical therapist worked with Petitioner on exercises designed to improve his right shoulder range of motion and flexibility.  *Id.* at 23-24.  The notes from this date reflect that the goals of physical therapy were for Petitioner to reach pain-free, full strength, and full active range of motion in 4-6 weeks, with a frequency of two to three visits per week.  *Id.* at 21-22, 26-27.

Three days after his initial evaluation with the physical therapist, on May 20, 2016, Petitioner returned to physical therapy.  Pet'r Ex. 5 at 19-20.  He reported that his shoulder hurt when performing exercises at home, and he was advised to alter the exercises and to not continue if he experiences pain.  *Id.* at 19.  Exercises were performed with the physical therapist, and Petitioner was to continue following up two or three times per week.  *Id.*

Three days later, on May 23, 2016, Petitioner reported to the physical therapist that "he only has pain with follow through when golfing" and he "can now reach up and close the hatch on [his] car."  Pet'r Ex. 5 at 17.  He also reported that he had poison ivy on both arms and was scheduled to see his physician after the physical therapy visit.  *Id.*  Exercises were performed with the physical therapist, and Petitioner was to continue following up to improve his range of motion and flexibility.  *Id.*

A note from the allergist's office dated May 23, 2016 reflects that Petitioner was seen on that date for a clinical visit.  Pet'r Ex. 9 at 84-92.  The provider noted that Petitioner had "poison ivy over most of [his] body starting 5/18 – day after workin[g] out in yard."[15]  *Id.* at 84.  In the history of present illness portion of the note, the provider documented that Petitioner was at the office to follow up for asthma, and that his allergies were stable on shots.  *Id.* at 85.  That section also contains a note that Petitioner "had a shoulder issue…flu shot injected into a bursa..with complications."[16]  *Id.*  In the same section, the provider noted that poison ivy was the reason for the visit, and that he "reviewed avoidance! And ivy block."  *Id.*  The past medical history section contains the notation: "bursa issue s/p flu shot."  *Id.*  There are no other notes regarding the flu injection or complications in the visit note.  *Id.*  The provider assessed that Petitioner had "contact dermatitis, rhus,"[17] which was worsening over the long term with recent moderate exacerbation.  *Id.* at 86.  He prescribed "burrows solution and [a] short course of prednisone," with an ivy block

---

[15] All punctuation is quoted as it appears in the allergist's notes.

[16] This is the first mention of the vaccine and the shoulder injury in any of the records from the allergist's office.

[17] Rhus dermatitis is an "allergic contact dermatitis due to exposure to plants of the genus *Rhus* that contain the sensitizing agent urushiol; the most common plants are poison ivy, poison oak, and poison sumac."  *Dorland's*, at 496.

in the future. *Id.* The prednisone was prescribed for May 23, 2016 through May 28, 2016. *Id.* at 86-87.

On May 26, 2016, Petitioner reported to the physical therapist that, due to the poison ivy on his arms, he "started prednisone so now [his] shoulder is less painful." Pet'r Ex. 5 at 15. The physical therapist added exercises during the session, and noted that Petitioner had improved posture during the visit. *Id.* at 15-16. The plan was to continue to improve Petitioner's range of motion and flexibility with sessions two or three times per week. *Id.*

Also on May 26, 2016, Petitioner received three injections from the allergist's office; one injection was in the lower right arm, and one was in the upper right arm. *Id.* No reactions were noted, and there are no comments from that visit. *Id.*

On June 1, 2016, Petitioner reported to his physical therapist that he had no pain but that his "right shoulder fe[lt] like it [wa]s going to fall out of the socket." Pet'r Ex. 5 at 13. The physical therapist again noted that Petitioner had "no pain while taking prednisone for poison ivy." *Id.* at 14. The physical therapist also noted that Petitioner was "gaining rotator cuff strength." *Id.*

On June 6, 2016, Petitioner visited podiatrist Stacy Resnick at Coordinated Health, the same group where Dr. Reid practices, complaining of a "[f]oot [p]roblem." Pet'r Ex. 4 at 24-25. The note reflects that Petitioner "picked up his new pair of custom orthotic[s] and dropped off his existing pair of orthotics for refurbishment." *Id.* at 24.

The next day, June 7, 2016, Petitioner returned to Dr. Reid, the orthopedist. Pet'r Ex. 4 at 26-27. Dr. Reid noted that Petitioner went to physical therapy and stated "he is much improved" as a result. *Id.* at 27. Dr. Reid also noted that Petitioner had received prednisone for poison ivy, which "helped his shoulder pain as well." *Id.* Upon examination, Dr. Reid documented "active abduction of 120 degrees, but full range of motion, 5/5 motor strength in all directions, no pain with flexion, no pain with abduction, no anterior joint laxity and no joint posterior laxity." *Id.* He also noted that tests demonstrated negative impingement sign of the right shoulder [and] no joint instability of the right shoulder." *Id.* In summary, Dr. Reid documented that Petitioner should follow up as needed. *Id.*

On June 16, 2016, Petitioner received four allergy injections; one injection was to his right upper arm, and one was to the right lower arm. Pet'r Ex. 9 at 81-83. There were no adverse reactions noted, and there are no comments from the visit. *Id.*

On July 5, 2016, Petitioner had a visit with Dr. Yurly Shevtziv at his primary care office about a poison ivy reaction. Pet'r Ex. 4 at 14-15. Petitioner reported a rash on the right side of his neck that appeared three days prior. *Id.* at 14. Dr. Shevtziv documented that Petitioner "[w]ent to [P]atient [F]irst [and] got Bactrim +steroids."[18] *Id.* Dr. Shevtziv assessed a rash "[secondary]

---

[18] No Patient First records were filed. Petitioner's prednisone prescription from the allergist would have been finished before this date. Pet'r Ex. 9 at 86-87. Therefore, it appears that Petitioner received a second steroid prescription from an unknown practitioner at Patient First.

to poison ivy – better with meds." *Id.* at 15. The note reflects that Petitioner should continue his prednisone until discontinued. *Id.*

The remainder of the medical records are allergist records reflecting that Petitioner continued to receive allergy injections from July 6, 2016 through December 2017, when the records were requested by Petitioner. Pet'r Ex. 9 at 1-81. Of note, Petitioner had an office visit on September 26, 2016 for a check-up and prescription refill, and the provider noted that Petitioner "does not get the flu shot due to a meniscus injury with a flu shot in the past." *Id.* at 58. At another office visit, on September 25, 2017, the provider again documented a "bursa issue s/p flu shot" in the past medical history section, which was "given by the patient, reviewed, and amended as necessary by the Provider." *Id.* at 13. Petitioner continued to regularly receive numerous allergy injections into both arms.

## III.   Other Filed Evidence

In addition to medical records, Petitioner submitted two affidavits on his own behalf, an affidavit from a co-worker, and an affidavit from his wife. Pet'r Ex. 2, ECF No. 1; Pet'r Ex. 6, ECF No. 14; Pet'r Exs. 7-8, ECF No. 22. After the hearing, at the direction of the undersigned, Petitioner also submitted a letter from his treating chiropractor, Dr. Rimbey. Pet'r Ex. 10, ECF No. 28.

### A.  Affidavits

#### i.    Petitioner's First Affidavit, Petitioner Exhibit 2

Petitioner filed his first affidavit as Petitioner Exhibit 2. ECF No. 1-5. In that affidavit, Petitioner stated that he received the influenza vaccination on September 29, 2015, at Target Pharmacy in Easton, Pennsylvania. Pet'r Ex. 2 at ¶ 3. Petitioner wrote that "[i]mmediately following the vaccination, [he] developed pain in his right shoulder." *Id.* at ¶ 4.

He wrote that his wife told him that he "would have pain after the flu shot and that it would hurt a lot." Pet'r Ex. 2 at ¶ 5. Although "after a few weeks it still hurt," his wife "insisted that the pain was normal." *Id.* Petitioner stated that "[s]ince [he] does not like going to doctors, [he] just tried exercising and stretching [his] right arm and shoulder on [his] own." *Id.* He then explained that "[i]t was only after [he] started noticing [he] was starting to lose some of [his] range of motion in [his] right shoulder that [he] began to worry something else was going on." *Id.* Petitioner stated that, after Thanksgiving, his wife "said to give it thr[ough] the holidays and if it was still hurting, [he] should go see a doctor about it." *Id.*

Petitioner represented that, "[w]hen [his] shoulder pain failed to resolve, [he] presented to Back in Action Chiropractic on January 11, 2016." Pet'r Ex. 2 at ¶ 6. He further represented that he "continue[s] to undergo treatment for [his] shoulder injury through the present." *Id.* at ¶ 7.

Regarding changes to his lifestyle "[s]ince the onset of [his] shoulder injury," Petitioner stated that he is "unable to perform many activities that [he] used to enjoy the way [he] was used to, the most important one being sleep." Pet'r Ex. 2 at ¶ 8. Petitioner explained that he can no

longer sleep the way that he slept for the prior fifty-five years of his life because his shoulder hurts after approximately thirty minutes. *Id.* Additionally, he stated that even if he falls asleep in a different position, movement during the night causes him to "wake up in pain." *Id.* As a result, he represented that he "ha[s] not gotten a truly complete night of sleep since [his] flu shot," and his wife is also affected because his new sleeping position causes him to "snore more than normal." *Id.* Petitioner described the "lack of a good night[']s sleep" as "by far the worst thing that [his] injury has caused in [his] life." *Id.* at ¶ 9.

Petitioner also stated that he "can no longer bowl right[-]handed due to [his] right shoulder." Pet'r Ex. 2 at ¶ 8. He explained that although he can hold the ball, "the back swing is when the pain hits, screwing up [his] swing." *Id.* His inability to bowl right-handed has affected his ability to teach as the unofficial bowling coach for his wife's bowling league. *Id.* Additionally, while Petitioner stated that he is "able to play golf," he noted that he has "had to shorten [his] back swing because when [he] take[s] a full turn, [his] right arm just hits the limit of [his] range of motion, causing a sharp pain to hit." *Id.* Petitioner also described that he is an "avid woodworker" but "now [has] to be very careful when handling long boards[,] because [he does not] know when the weight will become too much for [his] right shoulder." *Id.* He described himself and his wife as "avid gardeners," and noted that he has "always done all the heavy lifting work" related to their thirty-by-fifty foot vegetable garden. *Id.* at ¶ 9. He wrote that now, tasks such as carrying bags of garden soil and compost are more difficult and take more time. *Id.* Additionally, Petitioner explained that using certain tools aggravates his shoulder, so "what used to take [him] an afternoon now takes [him] 2-3 days to get done to minimize the pain to [his] right shoulder." *Id.* Petitioner added that he had to hire a landscaping crew to help with the maintenance of his garden and acre of property, as well as a lawn care company, because he is no longer "able to operate the aerator needed to help keep [his] lawn healthy." *Id.*

Petitioner also noted that he "now [has] difficulty with even the simplest tasks," such as getting dressed when he tries to wear a long sleeve shirt. Pet'r Ex. 2 at ¶ 9. He described difficulty reaching for the soap in the shower and drying himself off. *Id.*

###### ii.    Petitioner's Second Affidavit, Petitioner Exhibit 6

Petitioner filed his second affidavit as Petitioner Exhibit 6. ECF No. 14-1. Petitioner's second affidavit complies with the requirements of 42 U.S.C. §§ 300aa-11(c)(1). Petitioner wrote that he is a resident of the state of Pennsylvania, and that he received a vaccine set forth in the Vaccine Injury Table in Easton, Pennsylvania on September 29, 2015. Pet'r Ex. 6 at ¶¶ 1-2. Petitioner stated that he sustained a right shoulder injury caused by the administration of that vaccine, suffered the residual effects or complications of that injury for more than six months, and never received an award or settlement for his vaccine injuries or filed a civil action. *Id.* at ¶¶ 3-5.

###### iii.    Affidavit of Alex Hawley, Petitioner Exhibit 7

Petitioner filed an affidavit from Alex Hawley, a former co-worker, as Petitioner Exhibit 7. ECF No. 22-1. Mr. Hawley stated that, before receiving the flu vaccine in September 2015, Petitioner "never complained of pain or difficulty using his right arm or shoulder." Pet'r Ex. 7 at ¶ 4. Although he could not recall the exact date, Mr. Hawley stated that he "know[s] [Petitioner]

had the flu shot in September of 2015 because [Mr. Hawley's] father-in-law had the flu shot the same week." *Id.* at ¶ 5. Mr. Hawley explained that he believes that his father-in-law and Petitioner had the vaccine "within a few days of each other." *Id.* Mr. Hawley wrote that his father-in-law had a reaction that was "more severe" and "which necessitated his presentation to the hospital." *Id.* He stated that, on the same day, Petitioner told him that "he had a flu shot and that his arm was bothering him, it felt sore, 'not the same,' and that he had trouble lifting it." *Id.* Mr. Hawley stated that Petitioner "continued to complain about his shoulder for weeks and eventually went to the doctor for it." *Id.* at ¶ 6.

### iv.    Affidavit of Laurie Prestia, Petitioner Exhibit 8

Petitioner filed an affidavit from Laurie Prestia, his wife, as Petitioner Exhibit 8. ECF No. 22-2. Mrs. Prestia stated that Petitioner "never complained of pain or difficulty using his right arm or shoulder" before receiving the flu vaccine in September of 2015. Pet'r Ex. 8 at ¶ 4. She stated that he "had issues with his back and neck prior to receiving the flu shot, but he never had any issues with his arms or right shoulder." *Id.*

Mrs. Prestia wrote that she "regularly receive[s] the flu shot, and encouraged [her] husband to do the same, despite him never receiving it before." Pet'r Ex. 8 at ¶ 5. She recalled "telling him it was no big deal, go to Target and get the shot, you'll be fine." *Id.* Mrs. Prestia stated that "[r]ight after receiving the flu shot, [Petitioner] told [her] that it felt sore." *Id.* at ¶ 6. She "told him that it usually feels like you got hit with a baseball bat, [and] he said that's exactly what it feels like." *Id.*

Mrs. Prestia stated that Petitioner "would usually rest his right arm on the back of the couch" while watching television, but that "it hurt so much that he could not do that after receiving the flu shot." Pet'r Ex. 8 at ¶ 7. She described that "[o]ver the following days," Petitioner "kept complaining, but [she] continued to reassure him that it would be gone in a day or so, since that was [her] experience." *Id.* at ¶ 8. In the following weeks, "he kept complaining and [she] could see he was in pain." *Id.* at ¶ 9. Mrs. Prestia noted that Petitioner "has always been a right side sleeper," but that he stopped sleeping on his right side after receiving the flu shot. *Id.*

Mrs. Prestia then described how she "began searching the internet for answers" after she saw that Petitioner "was not getting any better." Pet'r Ex. 8 at ¶ 10. Mrs. Prestia stated that she "read that vaccines can cause shoulder injuries if the shot was given incorrectly." *Id.* She described feeling "guilty because [she] was the one who told [Petitioner] to get the flu shot." *Id.* She stated that she "did not tell [Petitioner] what [she] had read," and instead, "continued to tell him it would go away on its own." *Id.* However, "[a]fter [she] heard it long enough," she told Petitioner that he "should go to the doctor for it." *Id.* at ¶ 11. She added that she also told him that she did not "know if there is anything [the doctor] can do for [him;] that it could be because they administered it incorrectly." *Id.*

### B.  Letter from Treating Chiropractor, Dr. Rimbey, Petitioner Exhibit 10

After the hearing, the undersigned directed Petitioner to file "a letter or affidavit from Petitioner's treating chiropractor" that would help explain the chiropractor's records in Petitioner

Exhibit 3. Order, ECF No. 24. On January 10, 2018, Petitioner filed a letter authored by Dr. Rimbey. Pet'r Ex. 10, ECF No. 28-2.

In her letter, Dr. Rimbey explained that at each visit, a patient's "subjective complaint is given[, and] then an objective examination is performed to include active and passive ranges of motion of the area of complaint along with adjacent areas that may affect the area of complaint." Pet'r Ex. 10 at ¶ a1. She explained that she also examines soft tissue for any swelling, discoloration, tension, spasm, or adhesions. *Id.*

Dr. Rimbey described the process by which diagnosis codes are added or removed from a patient's visit notes. Pet'r Ex. 10 at ¶¶ a1-a2. She explained that the diagnosis codes "used on the billing [] date are the ones being used as active for that visit." *Id.* at ¶ a1. Diagnosis codes are removed if the condition is no longer being treated, and "may be added if the current condition has changed or there is a new condition." *Id.* at ¶ a2. Dr. Rimbey noted that "diagnosis codes are a required part of a visit[, so she] choose[s] the best [codes] suitable to [her] findings." *Id.* at ¶ b1.

Dr. Rimbey explained her understanding of diagnosis codes 840.8 and S43.401A, which she used in Petitioner's visit notes before and after his vaccination, respectively. Pet'r Ex. 10 at ¶ b1-c; *see* Pet'r Ex. 3. She indicated that diagnosis code 840.8, which is used to identify "sprains and strains of other specified sites of [the] shoulder and upper arm . . . should only be used for claims with a date of service on or before September 30, 2015." Pet'r Ex. 10 at ¶ b. According to Dr. Rimbey, S43.401A is part of the tenth edition of coding released by the Internal Classification of Diseases, which became the required edition for use as of October 1, 2015. *Id.* at ¶ c. She opined that "S43.401A converts approximately to 840.8[,] which was the previously used [International Classification of Diseases ninth edition] code." *Id.* Dr. Rimbey stated that she used the diagnosis code S43.401A, and specifically "initial encounter," at the October 1, 2015 visit because "it was the first time using the new classification." *Id.* Additionally, she explained that she found the new code "most appropriate as [Petitioner] was not treating frequently for a specific injury." *Id.* Dr. Rimbey noted that Petitioner's "visits were varied in subjective complaint" and "were typically scheduled as maintenance." *Id.*

Dr. Rimbey wrote that she was "unable to recall specific details of each patient visit" between September 12, 2012 and September 17, 2015, but described "the typical appointment for a routine visit" with Petitioner. Pet'r Ex. 10 at ¶ b1. She explained that his subjective complaints would "vary[] from left and/or right shoulder pain, lower back pain, elbow pain, hip and/or leg pain, muscle cramping." *Id.* Sometimes, Petitioner would have no complaints and the visit was only "a preventative check[-]up." *Id.* She described his visits "over the years" as varying from "mild to moderate." *Id.*

Dr. Rimbey stated that she "cannot recall any differences in [Petitioner's] complaints" when she began using the new diagnosis code. Pet'r Ex. 10 at ¶ e. Dr. Rimbey stated that, according to her notes, Petitioner "did not complain of right shoulder pain" at the October 1, 2015 visit. *Id.* at ¶ e1. She noted that "[i]f a muscle region such as shoulder is mentioned in [her] objective note but not in the patient subjective [section,] then [she] must have found muscular tension and released it as a preventative measure." *Id.* Dr. Rimbey explained that if there "was a

significant complaint or finding[, she] typically would follow up for several visits as [she] did previously for the hamstring." *Id.*

Dr. Rimbey wrote that she reviewed her 2016 visit notes, "during the time period [when] shoulder treatment was more frequent," and believes that "the first time the right shoulder became [Petitioner's] primary focus of his visit was February 8, 2016." Pet'r Ex. 10 at ¶ e2. At that time, she "did not suspect acute injury but rather a strength imbalance creating a movement dysfunction." *Id.* Dr. Rimbey explained that she prescribed exercises for Petitioner on that date and the next date when he reported that his shoulder was the same and not worse. *Id.* She stated that she "would not give [strength exercises] to someone if [she] suspected bursa or tendon inflammation." *Id.* Dr. Rimbey noted that Petitioner continued to report that his shoulder was the same, not worse, and she "continued to treat him . . . with various modalities for pain and range of motion." *Id.* She explained that she included a notation about the flu shot in her March 7, 2016 note in order for her to later "recall the patient mentioning it as a possibility." *Id.* However, she wrote that she "had never heard of such a correlation in [her] 20+ years of practice especially so long after the administration of the shot." *Id.*

Dr. Rimbey noted that Petitioner told her in April 2016 that he was going for an MRI, and she explained that "he must have seen another doctor" for that referral. Pet'r Ex. 10 at ¶ e2. In her practice, she "refer[s] out for MRI or second opinion when [she] suspect[s] a significant finding that would change treatment protocols." *Id.* With Petitioner, she "did not feel we were at that point," which explained, in her view, the "infrequency of treatment and the continued advisement on strength training." *Id.* Dr. Rimbey emphasized that she "was treating [Petitioner] for a dysfunctional muscle imbalanced shoulder that had common muscular tensions and adhesions in various areas." *Id.* She noted that the findings she made are "common findings among active individuals and respond favorably to early intervention using soft tissue therapies." *Id.* Her objective notes, such as "supraspinatus impingement" and "bursitis" were "only for the purpose of how to advise on exercise," and "did not change the diagnosis." *Id.*

Dr. Rimbey stated that Petitioner's visits became less frequent and "more maintenance related" throughout the rest of 2016. Pet'r Ex. 10 at ¶ e2. In summary, Dr. Rimbey stated that it is her "professional opinion that [Petitioner's] complaints of shoulder pain as they were treated at [her] office were not related to a flu shot administration but rather the normal wear and tear of an active individual." *Id.* at 3.

## IV. **Testimony**

Petitioner testified via video teleconferencing at a fact hearing held on December 12, 2017. ECF No. 26. He described his lifestyle and activities that he enjoys. Petitioner testified that he began golfing with his father when he a teenager, before high school. Tr. 32, 52. Petitioner also described himself as having "grown up in a bowling alley," where his father worked when he "was a little kid." *Id.* at 33. When his wife began bowling in a league, Petitioner explained that he helped her, and then her friends, and eventually "became the unofficial coach of the league." *Id.* He also testified that he and his wife enjoy gardening, and that there is a thirty-by-fifty foot garden with a raised bed behind their home. *Id.* at 32. He explained that he enjoys the "mindless work" of mowing and weeding. *Id.* Petitioner testified that he and his wife bought their house in 2000,

put in the garden that spring, and have done substantial work in the yard since then. *Id.* at 52. In addition to gardening, he also enjoys carpentry work. *Id.*

Petitioner described himself as "left eye dominant," but about "half and half" handed; he "do[es] some things left-handed, but [he] write[s] right-handed." Tr. 38. Petitioner described that he used to play baseball right-handed, he golfs right-handed, and he bowled right-handed until "seven or eight years ago [when] [t]here was something wrong with [his] right wrist." *Id.* At that time, he experienced carpel tunnel pain; it was "as if somebody was stabbing [his] right arm when the weight of the ball got at the bottom of the swing," so he started bowling left-handed. *Id.* at 38, 53. Petitioner testified that he only experienced the carpel tunnel pain was while bowling, and "to this day, the only time it ever hurts is if [he is] trying to lift something very heavy by the [ ] fingertips of [his] right hand." *Id.* at 53. He explained that "it was easy enough to switch hands" to avoid needing an operation. *Id.*

Petitioner testified that, before receiving the flu vaccination on September 29, 2015, he had "[n]o issues using his right arm or shoulder." Tr. 8. He explained that although Dr. Rimbey is a chiropractor, he treated with her "more as a sports therapist for working out in the yard and for playing golf and bowling and doing other activities." *Id.* Petitioner explained that Dr. Rimbey helped him with "muscle soreness and stretching" and also gave him "specific exercises to try and help [him] improve [his] golf game." *Id.* Petitioner testified that when he treated for "shoulder pain" with Dr. Rimbey, "[i]t was more of a pain in the center of [his] back under [his] right shoulder blade." *Id.* Thus, he did not consider it to be shoulder pain; instead, he believed she was treating him for his neck and back near the shoulder blade. *Id.*

Referring to his affidavit filed as Petitioner Exhibit 2, Petitioner testified that "unless [he is] basically dying, [he does not] go to a doctor unless [he has] to." Tr. 8. This is due to "some bad experiences with emergency rooms." *Id.* at 9. Petitioner described an incident in college where he experienced a severe allergic reaction and hospital staff "closed [him] in on one of those curtains, and [he] didn't see anybody for 30 minutes." *Id.* He also referred to another incident where a friend "almost died" after hospital staff "missed the fact that he had a broken neck." *Id.* at 10. Finally, Petitioner described an incident where he was initially released from an emergency room only to have an emergency appendectomy shortly thereafter. *Id.*

Petitioner explained that he visits his primary care physician when he needs a refill for medicines that he takes regularly and, now that he is retired, once a year for a physical. Tr. 10-11. He also explained that he is severely allergic to poison ivy, and encounters it regularly on his acre lot and on the golf course. *Id.* at 11. Petitioner stated that when he experiences a reaction, he goes to the doctor for treatment because over-the-counter medicines do not work for him. *Id.* In addition to those visits, Petitioner stated that he receives allergy shots every two to three weeks at an allergist's office. *Id.* at 12. He started receiving allergy shots "somewhere towards the end of the 1990s," then did not receive them for some amount of time after moving to a new state. *Id.* at 39. Petitioner restarted receiving the shots at least 15 to 18 years ago. *Id.* He testified that he never had "any pain in [his] right shoulder at the corner" after receiving allergy shots. *Id.* at 49-50. Petitioner testified that he "think[s] [he] had a tetanus booster within the last few years," but he could not recall ever having received a flu vaccine prior to September 29, 2015. *Id.* at 13-14.

He did recall that the nurses who administer his allergy shots "always bug you to get flu shots, and they give them there." *Id.* at 49.

Petitioner testified that he went to Target Pharmacy to get a flu shot "[a]fter a lot of urging from [his] wife." Tr. 13.  He explained that his wife has gotten a flu shot "every year that [he] can remember," although he "believe[s] she gets her flu shot . . . from [their] allergist." *Id.* at 54-55. Petitioner described sitting at "a short little table" while receiving the vaccine from the pharmacist, who was standing.  *Id.* at 13.  He testified that the administration of the flu vaccine "struck [him] as strange because it was so high on [his] arm." *Id.* at 14.  He stated that he "rolled [his sleeve] up like [he] normally do[es] for an allergy shot, and [the pharmacist] rolled it all the way up to the corner of [his] shoulder . . . and gave the shot really, really high." *Id.*  He explained that he has "a mole or some kind of growth right at that corner, and [the pharmacist] gave it just below that because the Band-Aid that he put on covered the mole." *Id.*

Petitioner described that his shoulder "began to hurt that night" and "was really sore." Tr. 14, 42-43.  He testified that his wife, who had received her flu shot a week before him at their mutual allergist's office, "said it's going to feel like somebody punched you really hard in the right shoulder." *Id.* at 14, 55.  Petitioner explained that "[i]t felt exactly like that," with the pain "[j]ust below where the shoulder curves down into [the top of] your arm." *Id.* at 14-15.  Petitioner stated that he "mentioned" the pain to his wife on the day he received the vaccine, telling her that it "hurt[] just like [she] said it was going to, like somebody punched [him]." *Id.* at 16.  However, when asked whether he recalled his wife ever experiencing pain after receiving a flu shot, Petitioner testified that "[t]he only time [he] remember[s] [his wife] ever mentioning pain was that year," after he received his vaccination at Target. *Id.* at 55.

Petitioner testified that the next morning, he noticed that his arm hurt when he took a shower.   Tr. 15.  He explained that the way that his shower is arranged, the soap dish is "up high toward the shower head." *Id.*  He described a "severe sharp pain" when attempting to reach behind him for the soap. *Id.*  Petitioner stated that he "couldn't even get close to lifting [his arm] to the level of [his] shoulder," and that it "hurt like somebody was stabbing [him]." *Id.*  Additionally, he stated that he usually used his right arm to hold the shower curtain while drying his feet, but he "could not lift [his] arm above [his] shoulder at all" on that morning "and for months after." *Id.* at 15-16.  He testified that he could not raise his arm above his shoulder or move it behind his back until after he completed physical therapy in 2016. *Id.* at 43.

Petitioner testified that he is "sure [he] told people" about the pain the next day at work, because he had to alter the way he worked in his position as an air traffic controller. Tr. 7, 16. Petitioner described the control tower where he worked at the time, and explained that he would ordinarily control a radar scope with his right hand while holding a talk switch with his left hand. *Id.* at 16.  However, on the day after his flu vaccination, he testified that he "couldn't reach the radar scope with [his] right arm [and he] had to move it with [his] left hand." *Id.*

Petitioner described the week following his vaccination. Tr. 17.  He stated that he could not raise his arm above his shoulder, and it hurt constantly. *Id.*  While he "used to sleep like the dead . . . out cold for six or seven hours," he testified that he "could not sleep on [his] right side at

all.  *Id.*  Even when sleeping on his left side, he said that his "right arm still hurt because of the weight of the arm."  *Id.*

Although Petitioner could not recall any specific information regarding the October 1, 2015 visit with Dr. Rimbey, he explained it was right after the Lehigh Valley Amateur golf tournament that he plays in every year at the end of September.  *Id.* at 41.  He testified that he "would have scheduled a visit probably in anticipation of needing to see [the chiropractor] after playing golf for a week."  *Id.* at 41.  He testified that at the appointment, two days after receiving the vaccine, he "would have mentioned to [Dr. Rimbey] that [he] had a flu shot a couple days earlier and that [his] right shoulder really hurt and that [he] couldn't lay on it."  Id. at 19, 41.  This would have been relevant, he testified, because he had to lay on his side for her to adjust his hips.  *Id.* at 41.  If the chiropractor "needed [him] to lay on [his] right shoulder, she had to figure something else out."  *Id.* at 19.  He explained that he would have mentioned the flu shot and right shoulder pain at the outset of the appointment, because she always asked how he was doing.  *Id.*  He testified that he would not have told her for treatment purposes.  *Id.*

With reference to the October 15, 2015 visit to the chiropractor where he was treated after hurting his hamstring gardening, Petitioner stated that he did not "specifically remember gardening in October 2015.  [He] just know[s] what is done to the garden at the end of the year that [he] would have been doing."  *Id.* at 43-44.  He did not recall the injury, but testified that it is "an injury that happens regularly to [him] when [he] garden[s] a certain way."  *Id.* at 44.  Specifically, the injury is "from bending down and pulling out weeds and pulling out the . . . corn and okra."  *Id.*  The okra in particular "has very, very deep roots, and getting them out of the ground at the end of the year usually hurts [his] back and [his] hamstring because [he is] doing a lot of bending and a lot of pulling and lifting with [his] leg."  *Id.*  Regarding the October 29, 2015 visit, Petitioner could not recall whether his shoulder pain was better or worse at that visit.  *Id.* at 44-45.

Petitioner explained that he did not have the chiropractor treat his shoulder at the visits from October through December 2015 because he "didn't know there was anything wrong."  Tr. 20.  He "was going on what [his] wife was telling [him] that you can't get hurt from a flu shot, that it's normal pain from the flu shot, and [he] just figured that eventually it would go away."  *Id.*  He testified that his wife "had said to wait until after the holidays" to visit a doctor about his shoulder, and "the beginning of December wasn't after the holidays."  *Id.* at 48.  He testified that he was "going to [Dr. Rimbey] for multiple aches and other things that had nothing to do with the right shoulder."  *Id.* at 20.  Petitioner stated that he "tried to increase [his] range of motion on [his] own" during this time by stretching and moving his shoulder.  *Id.*  He described "try[ing] to go to the point where the ice pick" pain started, and he would continue stretching "until [he] reached that point where it really hurt."  *Id.*

Petitioner testified that the "constant ache" continued through the end of 2015 and the holiday season.  Tr. 18.  He testified that his pain was "up around an 8 or 9 pretty much all the time" if he made the types of movements that triggered his pain.  *Id.* at 18, 51.  For example, when he raised his arm to shoulder height or higher, "it was as if somebody was standing there with an ice pick right at the corner of my shoulder."  *Id.* at 18.  He explained that a 10 on his scale would describe the "really sharp pain like somebody just stabbed you," while a zero or one on the scale "would be like a dull headache."  *Id.* at 51.  He testified that the accommodations he made for his

right arm at work "slowed [him] down significantly from how [he] normally would have done it." *Id.* at 18. In addition to changes in showering and at work, he also could not rake leaves in the fall. *Id.* Furthermore, he could not recall if it was snowy that year, "but if it was, [he] had to . . . buy a push shovel as opposed to a regular snow shovel because [he] couldn't really lift it." *Id.* at 18-19. Petitioner testified that he "probably wasn't doing a lot of golfing because of the winter, because of the temperature," but he continued to bowl during this time period. *Id.* at 47. He stated that his shoulder injury affected his bowling, because bowlers typically balance themselves with the opposite hand "as kind of like a wing." *Id.* He stated that he was not able to do that. *Id.* However, Petitioner testified that "it wasn't that big of a deal because when [he] was learning how to bowl, the bowling alley that [he] grew up in had a wall," which made it so that there was not "enough room to move your arm away from your body." *Id.* at 47. He explained that, although he was bowling right-handed while growing up, he "copied that bowling style" when he bowled left-handed. *Id.* It was unclear from his testimony whether Petitioner modified his bowling style after the vaccination or if he had been copying his right-handed style since he first began bowling left-handed several years prior. *See* Tr. 38, 53.

During this time, Petitioner continued to receive allergy shots in his right arm. Tr. 39. He described the location of the injections as "halfway between [his] right arm [sic] and [his] right shoulder," and not "anywhere near where the pain was." *Id.* at 39-40. Therefore, he explained, the pain "wouldn't have been a problem" when he received the injections. *Id.* at 49. While Petitioner testified that he is "sure" he mentioned his pain to the nurses administering his allergy shots, he could not "recall specifically saying anything." *Id.* at 40. He noted that "every year they always bug [patients] to get flu shots, and they give them there." *Id.* at 49. He testified that he "probably would have just mentioned that [he] had gotten a flu shot and that [his] arm hurt." *Id.*

Petitioner testified that his wife "was surprised that [he] still hurt" as time went on. *Id.* at 45. He said that she told him "to just wait until after the holidays . . . to see if it would go away, because she was expecting it to go away." *Id.* at 46. He testified that he was also "expecting it to go away[,] because [he] didn't know any better." *Id.* Petitioner testified that his wife is not a medical professional. *Id.* at 48. He explained that "[s]he just didn't know and she didn't believe that you could get hurt from a shot;" he stated that he did not know that it was possible, either. *Id.* at 55. Petitioner testified that he learned about the Vaccine Injury Compensation Program, and that "a shot could actually hurt you," in the "very, very beginning of 2016." Tr. 37-38. He explained that "it was [his] wife [who] told [him] that there might be something wrong," and he also "read about it online." *Id.* at 37.

Petitioner stated that at his January 11, 2016 chiropractic appointment, he "had [Dr. Rimbey] actually try and work on the right shoulder." Tr. 21. Petitioner explained that his wife told him to see a doctor after the holidays, and he already had the chiropractic appointment set. Tr. 21. He noted that he "was going to go to a doctor," but he saw the chiropractor first. *Id.* at 46. Petitioner testified that, at that point, he thought his arm hurt because the muscles were tight and believed that Dr. Rimbey could help him. *Id.* Although Petitioner's counsel pointed out that the first record of mobility dysfunction in his right shoulder post-vaccination is from the February 8, 2016 chiropractic visit, Petitioner testified that he would have discussed his right shoulder issues at "the beginning of the year in January." *Id.* at 21-22. When counsel pointed out that the first mention of the flu vaccine was in the March 7, 2016 record, Petitioner again stated that he first

mentioned right shoulder pain for treatment purposes in January of 2016. *Id.* at 22. Petitioner testified that Dr. Rimbey gave him additional stretches to do and she worked on trying to increase his range of motion, but the treatments did not improve his shoulder pain. *Id.* at 22-23. He stated that Dr. Rimbey recommended he go to an orthopedic specialist. *Id.* at 23. Petitioner explained that he needed a referral for insurance purposes, so he made an appointment with his primary care provider, Dr. Auerbach. *Id.*

Petitioner testified that, at his March 2016 visit with Dr. Auerbach, the doctor "confirmed that [Petitioner] had trouble [and] that there was something wrong with [his] right shoulder because [he] couldn't lift it and because of the pain that [he] was in." Tr. 24. The doctor ordered x-rays, and he referred Petitioner to orthopedic specialist Dr. James Reid when the films showed nothing remarkable. *Id.*

Petitioner testified that at his first visit with Dr. Reid, the doctor "verified that there was a problem with [Petitioner's] shoulder" and explained "a number of things that they could do to try and work with the shoulder." Tr. 24. Dr. Reid ordered an MRI, which Petitioner completed. *Id.* Petitioner testified that the pain was still the same and he could not lift his right arm above the horizontal plane of his shoulders "at all without severe pain" at the time he returned to Dr. Reid's office on April 12, 2016. *Id.* at 24-25. At that visit, Petitioner testified that Dr. Reid "said the MRI showed that the bursa was really, really inflamed[,] probably because the flu shot was put into the bursa instead of where it should have been in the right arm." *Id.* at 25. Petitioner stated that he did not want to have an operation, and Dr. Reid discussed a cortisone shot and other treatments that could be tried prior to surgery. *Id.* Petitioner recalled that the cortisone shot he received at that visit "was the first step," and that he also received specific shoulder exercises at some point. *Id.* at 25-26.

Petitioner recalled seeing Dr. Reid again on May 10, 2016. Tr. 27. He stated that the cortisone shot administered at the prior visit "didn't really seem to do anything." *Id.* Petitioner testified that he "still had very limited mobility [and] a lot of pain if [he] tried to raise [his] arm above [his] shoulder or behind [his] shoulder plane." *Id.* After that visit, Dr. Reid "sent [him] to physical therapy . . . as a step towards the operation that [he] really did not want to do." *Id.*

Petitioner testified that he was prescribed six physical therapy visits, or two visits per week for three weeks. Tr. 27. He stated that the physical therapy exercises were "very painful" at the beginning. *Id.* Petitioner explained that after four visits, he "got a really bad case of poison ivy over the weekend," for which he was prescribed prednisone. *Id.* at 27-28. After starting the prednisone, "the next two visits to physical therapy went extremely well," and he "got a lot of mobility back." *Id.* at 28. Petitioner stated that the physical therapist also gave him a handout with exercises to do at home. Tr. 28. He testified that he still does one of the exercises, which stretches his shoulder, "probably every day or every other day." *Id.* at 28-29.

When he went back to Dr. Reid's office on June 7, 2016, Petitioner testified that he "was feeling better," and that "[t]he pain was down to a dull ache." Tr. 29. He explained that he "had a good bit of mobility back, but not as it was before the shot." *Id.* Petitioner testified that Dr. Reid told him "if down the road the shoulder gave [Petitioner] more problems," he would probably try prednisone first and "see if that helped with the inflammation before doing anything else." *Id.*

Petitioner stated that he has not seen a doctor for his injury since June 7, 2016.  Tr. 30. While he continues to see the chiropractor "for muscle aches and pains and for golf," his right shoulder is now "just one of the things she works on," but "not specifically because of the injury." *Id.*  Petitioner testified that he has "learned to live with the lack of mobility." *Id.*  Petitioner explained that he has modified how he does things.  *Id.*  He has "just learned that [he does not] reach for things up high that really have any weight with [his] right arm." *Id.*  Petitioner stated that if he "forget[s] and [he] instinctively reach[es] for something with [his] right arm, it hurts and reminds [him]." *Id.*  Petitioner testified that he has not been prescribed prednisone for his shoulder since the May 2016 prescription coincidentally helped, but notes that he has "probably had it maybe once or twice more since then for poison ivy." *Id.* at 29.  Petitioner stated that he has not "gotten any more mobility back" since he had the prednisone prescription in May of 2016, and the more recent prescriptions for his poison ivy did not "seem[] to do anything other than the first time." *Id.* at 29-30.

Despite his decision to no longer treat his shoulder, Petitioner described the pain he experiences to this day as a "constant ache, like the arm is constantly waking up from having fallen asleep located right at the corner of [his] shoulder." Tr. 31.  Although it is "a dull ache [with] pain around a 6 [out of 10] all of the time . . . if [he] do[es] the wrong thing with [his] arm, it will pop up to around an 8 or a 9." *Id.*

Petitioner retired from his job as an air traffic controller in August of 2016, so he does not "have to worry about the radar scope anymore." Tr. 30.  He testified that has changed how he reaches for the soap in the shower. *Id.* at 31.  While Petitioner affirmed that he still gets the same enjoyment out of golf that he did prior to his vaccination, he testified that he "had to change [his] approach to how [he] play[s] the game because of the shoulder." *Id.* at 32.  He also testified that he had to change how he taught the women in his wife's bowling league. *Id.* at 34.  Petitioner testified that before the vaccination, he would use his right arm to demonstrate what he was teaching, but "after the shot, [he] couldn't lift the bowling ball to do it." *Id.*  He stated that it therefore took longer for him to teach the women.  *Id.*  Petitioner testified that after physical therapy and the prednisone prescription, he is "able to demonstrate again . . . as far as how to release the ball, how to get it to roll the way [he] want[s] it to roll" with a light bowling ball. *Id.* He testified that the injury did not affect his ability to bowl on his own, because he had bowled left-handed for seven or eight years. *Id.* at 34, 38.  Petitioner also testified that he did not have a garden in 2016 and now has a lawn care company assist with tasks he used to enjoy. *Id.* at 53.

In addition to the impact his injury has had on his daily activities and hobbies, Petitioner testified that he still cannot sleep on his right shoulder.  Tr. 17.  He feels he has not "gotten a solid night's sleep" since receiving the flu vaccination. *Id.*  He first testified that he wakes up every 30 to 40 minutes "because of [his] right shoulder aching," and later described waking up every 20 or 30 minutes.  *Id.* at 17, 35.  Petitioner explained that his lack of sleep has caused him to sleep "longer and longer into the morning," so his "days are now shorter." *Id.* at 35.  Petitioner testified that he also cannot snuggle with his wife because if he drapes his right arm over her, it "starts to ache to the point where it's painful to keep it there" after 20 or 30 minutes.  *Id.* at 17-18, 35. Whereas he "used to snuggle with her all the time," he can now only do so once or twice a week for a limited amount of time. *Id.* at 35-36.

29

## V.    **Applicable Law**

Under the Vaccine Act, petitioners are required to establish the facts supporting their claim by a preponderance of the evidence.  42 U.S.C. § 300aa-13(a)(1)(A).  The preponderance of the evidence standard "requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence."  *Moberly v. Sec'y of HHS*, 592 F.3d 1315, 1322 n. 2 (Fed. Cir. 2010) (citations omitted).

The Vaccine Act expressly provides that a special master may not find that a petitioner has met his burden "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion."  42 U.S.C. § 300aa-13(a)(1).  Therefore, the process for finding facts in Vaccine Act cases begins with analyzing the medical records from before and after the vaccination, as well as the vaccination records themselves.  *See* 42 U.S.C. § 300aa-11(c)(2).  Relevant case law provides that "[m]edical records, in general, warrant consideration as trustworthy evidence."  *Cucuras v. Sec'y of HHS*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Where testimony conflicts with contemporaneous medical records, more weight is generally accorded to the medical records.  *Cucuras*, 993 F.2d at 1528 (*citing U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948)); *see also Rickett v. Sec'y of HHS*, 468 Fed. Appx. 952, 958 (Fed. Cir. 2011).  However, "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance.  Since medical records typically record only a fraction of all that occurs, the fact that reference to an event is omitted from the medical records may not be very significant."  *Murphy v. Sec'y of HHS*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992).

## VI.    **Discussion**

The medical records in this case support a finding that Petitioner was suffering from shoulder impingement, rotator cuff tendonitis, and a labral tear of the shoulder as of April 8, 2016.  Pet'r Ex. 5 at 7-10 (Dr. Reid's assessment based on the MRI results), 28-30 (MRI results).  The ultimate question in this case will be whether Petitioner's documented injury to his right shoulder was caused by the administration of the influenza vaccine on September 29, 2015.  At this stage of the claim, however, the issue to be decided is when the first symptoms of the relevant right shoulder injury occurred.

The most recent changes to the Vaccine Injury Table became effective on March 21, 2017.  *National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table*, 82 Fed. Reg. 6294 (Jan. 19, 2017); *National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table; Delay of Effective Date*, 82 Fed. Reg. 11321 (Feb. 22, 2017).  Among the changes, SIRVA was added as a presumptive injury for an influenza vaccine if the first symptom or manifestation of onset or of significant aggravation after vaccine administration occurred within 48 hours after the vaccine was administered.  42 C.F.R. § 100.3(a)(XIV)(B).  While these changes are not applicable to Petitioner's claim because they were made after his petition was filed, the table changes and the accompanying qualifications and aids to interpretation ("QAI") are nonetheless illustrative and help frame the analysis of the facts currently in dispute.

The QAI applicable to the Vaccine Injury Table provide guidance regarding shoulder injuries related to vaccine administration. 42 C.F.R. § 100.3(c)(10). "A vaccine recipient shall be considered to have suffered SIRVA" if four conditions are met. *Id.* First, the vaccine recipient must have "[n]o history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection." *Id.* § 100.3(c)(10)(i). Next, pain must occur within the specific time-frame of 48 hours. *Id.* § 100.3(c)(10)(ii). Third, pain and reduced range of motion must be limited to the shoulder in which the intramuscular vaccine was administered. *Id.* § 100.3(c)(10)(iii). Finally, Petitioner must have "[n]o other condition or abnormality" which would explain his symptoms, such as "clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy." *Id.* § 100.3(c)(10)(iv).

Although the question presented here is not whether the Petitioner can establish a table claim, the factors are helpful in determining when the onset of relevant symptoms occurred. In this case, the two main issues to be determined are: (1) whether Petitioner's pre-vaccination shoulder complaints would explain the injuries he claims were caused by the vaccination; and (2) the specific time-frame in which the pain that Petitioner attributes to the vaccine began.

## A.  History of Shoulder Complaints Pre-Vaccination

Dr. Rimbey's chiropractic visit notes from the time before Petitioner received the flu vaccine reflect that he periodically suffered from muscle pain in various areas of his body, particularly his neck and back. While the diagnosis code for "shoul[d]er sprain/stain" is included in the chiropractor's notes more often than not, it does not always correspond with subjective findings, objective findings, or treatment.[19] *See* Pet'r Ex. 3 at 1-8, 10-23, 31-66, 85, 89-92. Where Dr. Rimbey described pain or mobility issues related to either of Petitioner's shoulders, she often referred to the scapula, shoulder blade, or posterior shoulder tension generally. *Id.* at 7, 11, 19-20, 32-33, 37, 42, 45, 47, 49, 52, 55-56, 61-62, 64-65. Dr. Rimbey specifically referenced the glenohumeral joint on only a few occasions. *Id.* at 21-22, 58. She also only occasionally referenced muscle spasms in the shoulder muscles. *Id.* at 35-36, 51, 53, 55, 57. Importantly, while Petitioner's visit notes sometimes reflected right[20] and/or left[21] shoulder pain or dysfunction, there

---

[19] Furthermore, between September 2014 and September 2015, the shoulder-related diagnosis code is listed twice in every visit note, but the subjective and objective notes are not markedly different than they were when the code was only listed once per note. *See* Pet'r Ex. 3 at 45-66. There is no explanation in the record for why a diagnosis code would appear twice in a note.

[20] Pet'r Ex. 3 at 11 ("decreased rotation" in the right scapula); *id.* at 32 ("right post[erior] scapula tension"); *id.* at 33 ("right post[erior] scapula tension"); *id.* at 37 ("right shoulder blade pain"); *id.* at 39 ("[r]ight . . . shoulder adduction"); *id.* at 49 ("[r]ight post[erior] shoulder capsule tight limiting adduction"); *id.* at 58 ("tight shoulder R>L. posterior GH joint").

[21] Pet'r Ex. 3 at 9 (tightness in the left posterior shoulder); *id.* at 12 (left posterior shoulder tension); *id.* at 20 (decreased rotation of the left scapula); *id.* at 21 ("[l]eft posterior shoulder tension @ GH with horizontal adduction"); *id.* at 35 ("tight . . . left scapular ROTC muscles"); *id.* at 36 ("tight . . . left scapular ROTC muscles"); *id.* at 45 ("[l]eft scapula decreased R[ange] O[f] M[otion] in

is no indication that Petitioner was receiving any ongoing treatment for a specific injury related to either of his shoulders.

In Dr. Rimbey's letter submitted after the hearing, she was "unable to recall specific details of each patient visit" and therefore could not provide any elaboration on Petitioner's shoulder-related complaints between September 12, 2012 and September 17, 2015. Pet'r Ex. 10 at ¶ b1. However, consistent with her visit notes, she wrote that Petitioner's complaints would "vary[] from left and/or right shoulder pain, lower back pain, elbow pain, hip and/or leg pain, [or] muscle cramping," and that sometimes he would have no complaints and would be "there for a preventative check[-]up." *Id.*

Petitioner's testimony regarding his pre-vaccination shoulder issues was consistent with Dr. Rimbey's visit notes and her letter. Petitioner explained that he saw Dr. Rimbey for help with "muscle soreness and stretching" related to "working out in the yard[,] playing golf[,] bowling[,] and doing other activities." Tr. 8. He explained that she also gave him "specific exercises to try and help [him] improve [his] golf game." *Id.* Petitioner's testimony that any "shoulder pain" treated by Dr. Rimbey was "more of a pain in the center of [his] back under [his] right shoulder blade" was also consistent with Dr. Rimbey's notes. *Id.*

Based on the medical records, the letter from Dr. Rimbey, and Petitioner's testimony, the undersigned finds that **Petitioner did not suffer from any significant injury to either shoulder prior to September 29, 2015**.

## B. Post-Vaccination Pain Onset

Petitioner consistently described, in his affidavit and testimony, a new and severe pain in his right shoulder starting on the same day that he received the flu vaccine. Petitioner stated in his affidavit that the pain in his right shoulder began "[i]mmediately following the vaccination." Pet'r Ex. 2 at ¶ 4. In his testimony, Petitioner described that his shoulder "began to hurt that night" and "was really sore." Tr. 14, 42-43. Petitioner described the pain as "a constant ache," and rated it at "around an 8 or 9 [out of 10] pretty much all the time" through the end of 2015. Tr. 18.

Petitioner's description of the onset of range-of-motion issues was not as consistent between his affidavit and later testimony. In his affidavit, Petitioner explained that his wife told him that he "would have pain after the flu shot and that it would hurt a lot," so "[a]t first [he] thought that was all it was." Pet'r Ex. 2 at ¶ 5. Petitioner wrote that "after a few weeks it still hurt," but upon his wife's insistence that the pain was normal and due to his opposition toward going to the doctor, he attempted to exercise and stretch the shoulder on his own. *Id.* According to his affidavit, "[i]t was only after [he] started noticing [he] was starting to lose some of [his]

---

backswing of golf"); *id.* at 47 ("[l]eft scapula anterior tilt"); *id.* at 51 ("[l]eft rhomboid, levator[,] and subscapularis spasm"); *id.* at 52 ("[l]eft scapular elevation with spasm"); *id.* at 55 ("report[ed] left arm over head motion decreased with scapula restriction;" and "[l]eft . . . subscap[ularis] spasm limiting posterior scapular glide"); *id.* at 57 ("[a]dhesions" in several muscles in the left shoulder); *id.* at 64 ("referred pain to left par[a]scapular area"); *id.* at 65 ("referred pain to left par[a]scapular area").

range of motion in [his] right shoulder that [he] began to worry something else was going on." *Id.* It was "[a]fter Thanksgiving" that his wife suggested he wait until after the holidays to see a doctor. *Id.* Thus, although the timeline is somewhat unclear based on that description, Petitioner's affidavit described at least a few weeks of time where Petitioner had pain but did not notice a loss in his range of motion. In contrast, during his testimony, Petitioner described that he "couldn't even get close to lifting [his arm] to the level of [his] shoulder" while showering the morning after he received the vaccine. Tr. 15. He also described needing to modify how he worked the day after the vaccination due to a loss in his range of motion. *Id.* at 16. While these discrepancies are not enormous, they suggest that Petitioner's recollection regarding the timeline of when his symptoms began may be fading with the passage of time.

Affidavits from Petitioner's wife and a former coworker generally support Petitioner's testimony regarding onset. His former coworker, Mr. Hawley, wrote that Petitioner said "his arm was bothering him" after a flu shot in 2015. Pet'r Ex. 7 at ¶ 5. The timing of Petitioner's flu shot was memorable to Mr. Hawley, because his "father-in-law had the flu shot the same week" and suffered a more severe reaction. *Id.* Mr. Hawley wrote that Petitioner "continued to complain about his shoulder for weeks and eventually went to the doctor for it." *Id.* at ¶ 6. Petitioner's wife, Mrs. Prestia, stated in her affidavit that she regularly receives the flu vaccine and encouraged Petitioner to "go to Target and get the shot" in September 2015, "despite him never receiving it before." Pet'r Ex. 8 at ¶ 5. Mrs. Prestia described that she told Petitioner that "it usually feels like you got hit with a baseball bat." *Id.* at ¶ 6. This is consistent with Petitioner's recollection that she told him it was "going to feel like somebody punched you really hard in the right shoulder." Tr. 14. Mrs. Prestia stated in her affidavit that she "continued to reassure [Petitioner] that [the pain] would be gone in a day or so" in the days following the vaccine, as "that was [her] experience." Pet'r Ex. 8 at ¶ 8. Her timeline then became somewhat amorphous, and she stated that Petitioner continued complaining "[o]ver the following weeks." *Id.* at ¶ 9. Mrs. Prestia then described finding information about shoulder injuries related to vaccines on the internet, but stated that she "continued to tell [Petitioner] that it would go away on its own." *Id.* at ¶ 10. She wrote that she eventually told him to see a doctor after she had "heard it long enough." *Id.* at ¶ 11.

In contrast to the foregoing, however, records from the chiropractic visits in the three months that followed Petitioner's receipt of the flu vaccine do not support Petitioner's account of the days, weeks, and months following his vaccination. For example, two days after receiving the flu vaccine, on October 1, 2015, Petitioner saw his chiropractor. Pet'r Ex. 3 at 67. He testified that the appointment was previously scheduled "in anticipation of needing to see [the chiropractor] after playing golf for a week" in a local amateur tournament.[22] Tr. 41. While Petitioner could not remember the appointment specifically, he testified that he "would have mentioned" the flu vaccine and his alleged resulting pain at the outset of the appointment. *Id.* at 19, 41. He explained that the mention would have been intended to advise Dr. Rimbey that he could not lay on his right shoulder as was typical while she administered hip adjustments. *Id.* at 19. While Dr. Rimbey's

---

[22] The dates of the tournament are not clear. Petitioner's testimony that the "Lehigh Valley Amateur [tournament] is always the last full week end in September" suggests that the tournament was September 26-27, 2015. Tr. 41. However, Petitioner also described "playing golf for a week" and noted that his appointment was made for October 1, 2015 "because of the tournament that was the previous week." Tr. 41.

visit note reflects that range of motion/flexibility exercises and myofascial release were administered to a hip for 30 minutes, there is no indication that the treatments were adjusted due to a problem with Petitioner's shoulder.  Pet'r Ex. 3 at 67.  The only note is that Petitioner "tolerated [the] treatment well."  *Id.*  There are likewise no subjective or objective notes regarding Petitioner's shoulder in the visit note.  *Id.*

There is a change in the assessment diagnosis codes between the previous visit note and the note from October 1, 2015 that could support Petitioner's allegations of a new kind of shoulder pain.  *See* Pet'r Ex. 3 at 66-67.  While previous visit notes regularly contained the diagnosis code "840.8 Shoul[d]er sprain/strain," the note from October 1, 2015 and each of the notes that follows contains the diagnosis code "S43.401A Unspecified sprain of right shoulder joint, init encntr."  *See id.*  Dr. Rimbey explained in her letter submitted after the hearing that she changed the diagnosis code used because the coding requirements changed as of October 1, 2015.  Pet'r Ex. 10 at ¶ b.  Although the previous code did not specify a shoulder and the new code specified that it was for the right shoulder, Dr. Rimbey reported that the new code "converts approximately" to the old code, and she "found it [to be the] most appropriate [new code] as he was not treating frequently for a specific injury."  *Id.* at ¶ c.  It was also not unusual for Dr. Rimbey to include the shoulder-related assessment code even when there were no subjective complaints, objective findings, or treatments administered to Petitioner's shoulders.  Thus, the change in the diagnosis code used does not persuasively support Petitioner's report that he mentioned any new (vaccine-related) right shoulder pain at the visit.

At a chiropractic visit on October 15, 2015, Petitioner reported that his subjective shoulder pain was the "same," but there were no objective or treatment notes related to either of Petitioner's shoulders documented on that date.  Pet'r Ex. 3 at 68.  Instead, treatment focused on Petitioner's complaint that "he hurt his hamstring gardening."  *Id.*  Although Petitioner could not recall this visit specifically, he testified that the hamstring injury is "an injury that happens regularly to [him] when [he] garden[s] a certain way."  Tr. 44.  He explained that during the fall, he would generally be "bending down and pulling out weeds and pulling out the . . . corn and okra" in his garden.  *Id.*  The chiropractic visit notes from October 29 and December 9, 2015 again did not contain any notation of an issue with Petitioner's right shoulder, and instead the focus continued to be on his left leg complaint from the October 15, 2015 visit.  Pet'r Ex. 3 at 69-70.

Petitioner's description of the gardening that he was doing also undermines his contention that his shoulder was in pain and his range of motion was limited during the months after he received the flu vaccine.  Petitioner's statement that he could not rake leaves during the fall season is particularly inconsistent with the record documenting that he was still performing yard work and his description of what that yard work entailed.  Pet'r Ex. 3 at 68; Tr. 18, 44.  Similarly, Petitioner testified that he could not "remember if it was really snowy that year," but suggested that "if it was" really snowy that year, he "had to . . . buy a push shovel as opposed to a regular snow shovel because [he] couldn't really lift it."  Tr. 18-19.  Based on that testimony, it is unclear whether Petitioner actually had any trouble shoveling during the months after receiving the flu vaccine.

Petitioner's explanation for the lack of documentation regarding his alleged shoulder injury in the chiropractic records from October to December 2015 was that he did not ask Dr. Rimbey to

Case 1:17-vv-00013-UNJ   Document 37   Filed 06/08/18   Page 35 of 41


treat his shoulder at that time and only mentioned the issue tangentially. Tr. 19-20. However, it is not persuasive that Petitioner mentioned or exhibited any new pain or range of motion issues related to his right shoulder during this time. Dr. Rimbey explained that she would sometimes "f[ind] muscular tension and release[] it as a preventative measure," even if Petitioner did not make a subjective complaint about a particular muscle. Pet'r Ex. 10 at ¶ e1. While Dr. Rimbey's notes were not always detailed, she regularly documented new subjective reports and objective findings in Petitioner's notes. *E.g.*, Pet'r Ex. 3 at 59 (note reflecting that Petitioner "entered the office with a new condition" and was "complaining of left ankle and low back pain" because he "fell into a sink hole in his yard"). Even if Petitioner was not asking Dr. Rimbey to treat any shoulder pain that he mentioned, it does not seem likely that Dr. Rimbey would fail to document in any way a report or objective finding that Petitioner was suddenly experiencing constant pain at a high level and range of motion limitations in his right shoulder. Sudden and severe shoulder pain with a drastic change in range of motion would certainly have been relevant to Dr. Rimbey's usual assessments, which included golf evaluations[23] and general maintenance visits to help him with "muscle soreness and stretching" related to "working out in the yard[,] playing golf[,] bowling and doing other activities." Tr. 8.

Petitioner also did not persuasively account for the lack of documentation regarding his alleged injury in the allergist's records. Preliminarily, it is unclear why Petitioner's wife would tell him to "go to Target and get the shot" when he was going to the allergist's office regularly. Pet'r Ex. 8 at ¶ 5. Petitioner testified that the nurses administering his allergy injections "always bug [patients] to get flu shots," and he knew that they administered the vaccine at that office. Tr. 49. Furthermore, Petitioner received allergy injections only five days prior to receiving the flu vaccine, and another round just over two weeks later. Pet'r Ex. 9 at 116-17, 118-23. The records reflect that two of the injections received at the later appointment, on October 15, 2015, were administered to Petitioner's right arm. *Id.* at 116-17. Petitioner explained the lack of reference to his pain in the allergist's records by stating that the pain "wouldn't have been a problem" when he received the allergy injections because they were not administered "anywhere near where the pain was." Tr. 40, 49. While Petitioner testified that he is "sure" he mentioned his pain to the nurses administering his allergy shots, he could not "recall specifically saying anything." *Id.* at 40. He testified that he "probably would have just mentioned that [he] had gotten a flu shot and that [his] arm hurt." *Id.* This testimony is inconsistent with Petitioner's testimony that the administration of the flu vaccine "struck [him] as being strange because it was so high on [his] arm," compared with his regular allergy shot administrations. *Id.* at 14. If Petitioner considered the pharmacist's administration of the vaccine to be "strange" such that he could remember it in detail two years later, it is not persuasive that he would fail to disclose sudden and severe pain and range of motion limitations that began immediately after the flu shot administration to the nurses administering his

---

[23] Although Petitioner testified that he "probably wasn't doing a lot of golfing because of the winter, because of the temperature," Tr. 47, visit notes from prior years indicate that Dr. Rimbey typically continued to assess Petitioner's golf performance through November and December. Pet'r Ex. 3 at 18 (November 22, 2013 visit note reflecting performance of a "Gol[f] Eval"); *id.* at 22 (December 26, 2013 visit note reflecting performance of a "golf review"); *id.* at 49 (November 13, 2014 visit note reflecting subjective complaints of pain "with golf follow through[]").

allergy shots.   Additionally, it does not seem likely that the nurses would fail to note such information in his record.[24]

Petitioner also repeatedly explained that he delayed seeking treatment for his shoulder until "after the holidays" on the recommendation of his wife.  Tr. 20-21, 45-46, 48; Pet'r Ex. 2 at ¶ 5. Petitioner's wife's guidance may have been the reason why he did not see his primary care physician or a specialist until 2016.   However, it does not explain why he delayed seeking treatment from Dr. Rimbey, who he saw on four occasions after his vaccination and before January 2016.   Petitioner explained that he did not have the chiropractor treat his shoulder at the visits during October through December 2015, because he "didn't know there was anything wrong."   Tr. 20.   He testified that he "was going on what [his] wife was telling [him] that you can't get hurt from a flu shot, that it's normal pain from the flu shot, and [he] just figured that eventually it would go away."   Id.   He explained that his wife gets a flu shot every year, and she "said it's going to feel like somebody punched you really hard in the right shoulder."   Id. at 14, 54-55.   Petitioner explained that "[i]t felt exactly like that."   Id. at 14.   Although Petitioner placed a lot of emphasis on his wife's opinion that the pain was normal, he later testified that "[t]he only time [he] remember[s] [his wife] ever mentioning pain [related to a flu vaccine] was that year" when he got the flu shot at Target.   Id. at 55.   Additionally, Petitioner testified that his wife had received her flu vaccination a week before he received his, but there is no indication that she experienced any significant pain or range of motion issues following that vaccine.  Tr. 14; see Pet'r Ex. 8 at ¶ 8 (Mrs. Prestia's affidavit indicated that in her experience, vaccine-related pain resolves "in a day or so").   It is therefore not persuasive that either Petitioner or his wife would think the pain he described having would be normal or consistent with his wife's experiences.

Moreover, Petitioner received multiple allergy shots on a regular basis, and consequently would have known how he usually feels after receiving injections.[25]   While Petitioner testified that he could not remember ever having gotten a flu shot, his medical records reflect that he had received the flu vaccine on at least three occasions from his allergist, including as recently as one year before the vaccine at issue in this case.  Tr. 13-14; Pet'r Ex. 13 at 3, 10.   Therefore, it is unusual that Petitioner would not remember how it felt to receive a flu vaccination, at least to the extent that he would recognize that it would be abnormal to have severe and continuing pain after the injection.   Given his history, it is not persuasive that Petitioner would suffer from severe and chronic pain and range of motion limitations for more than three months without a suspicion that something was amiss, and without informing his existing, long-standing treater about it, regardless of whether he or his wife suspected that the flu vaccine could have caused the problem.

---

[24] Other notes from the allergist's office reflect that comments can be added to the electronic record in addition to the list of injections administered at a particular appointment.  See Pet'r Ex. 9 at 136.

[25] A SIRVA injury is not caused by the particular contents of a vaccine.  Instead, SIRVA symptoms "are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.)."  42 C.F.R. § 100.3(c)(10).

Petitioner testified that when he sought treatment after the holidays, he "was going to go to a doctor," but saw Dr. Rimbey first because he already had the appointment set. Tr. 21, 46. In explaining why he thought chiropractic treatment might help at that point, Petitioner testified that Dr. Rimbey "works muscles," and he "just thought [his] arm hurt because the muscle hurt and [he] couldn't move [his] arm because the muscles were tight." *Id.* at 46. However, this explanation is at odds with Petitioner's description of severe pain and range of motion issues for the three prior months. It is also inconsistent with his testimony that he had "tried to increase [his] range of motion on [his] own" by stretching and moving his shoulder during the prior three months without seeking treatment. *Id.* at 20. If Petitioner thought that Dr. Rimbey could help his alleged condition, it is not persuasive that he would wait until "after the holidays" for treatment, especially because he was already scheduled to see her, and did see her, on numerous occasions during the holiday season.

Petitioner stated that at his January 11, 2016 visit with Dr. Rimbey, he had the chiropractor "actually try and work on the right shoulder." Tr. 21. Petitioner clearly recalled during his testimony that he discussed his right shoulder concerns with the chiropractor at the beginning of January 2016. *Id.* at 21-22. However, the visit notes from January 2016 do not reflect any change in treatment from the prior visits. Dr. Rimbey referenced Petitioner's "right deltoid" in the visit note from January 11, 2016, but there was no related objective finding noted. Pet'r Ex. 3 at 71. There was nothing about left or right shoulder pain in the subjection portion of the note, and nothing indicated that Petitioner told Dr. Rimbey that any pain or range of motion issues he was experiencing on that date began three and a half months earlier, or that they started immediately after the flu vaccination. *Id.* Dr. Rimbey administered range of motion/flexibility exercises and myofascial release to Petitioner's hip and shoulder at the visit, but did not specify which shoulder received treatment. *Id.* Furthermore, the January 25, 2016 note was silent regarding any shoulder issues; the visit note reflected a primary focus on Petitioner's hips, and reflected no treatments to the shoulders. *Id.* at 72.

The chiropractic visit notes began to document a developing issue with Petitioner's right shoulder on February 8, 2016. Pet'r Ex. 3 at 73. In the note from that date, shoulder pain was listed as subjectively "worse," and Dr. Rimbey documented "[j]oint mobility dysfunction and tissue extensibility dysfunction in the right shoulder." *Id.* Range of motion/flexibility exercises were administered to the shoulder, and the plan was to "[s]ee [Petitioner] again in one week." *Id.* Dr. Rimbey wrote in her post-hearing letter that this visit was "the first time the right shoulder became [Petitioner's] primary focus." Pet'r Ex. 10 at ¶ e2. However, Dr. Rimbey "did not suspect acute injury" at this visit based on Petitioner's complaints, and instead thought that a "strength imbalance [was] creating a movement dysfunction." *Id.* Notably, Dr. Rimbey did not document whether Petitioner told her at this visit how long he had been experiencing pain in his right shoulder. If Petitioner had told Dr. Rimbey at this visit that his pain had begun acutely four months prior and persisted since that time, Dr. Rimbey may have suspected a more serious issue than strength imbalance.

The medical records reflect that Petitioner continued to treat only with the chiropractor for the rest of February and most of March 2016. On February 16, 2016, Dr. Rimbey documented that Petitioner's subjective shoulder pain was the "same." Pet'r Ex. 3 at 74. Dr. Rimbey administered range of motion/flexibility exercises to the shoulder and also advised additional

exercises. *Id.* In her post-hearing letter, Dr. Rimbey emphasized that she still did not suspect an acute injury at that time, and she "would not give [strength exercises] to someone if [she] suspected bursa or tendon inflammation." Pet'r Ex. 10 at ¶ e2. Dr. Rimbey saw Petitioner again on March 7, 2016, and shoulder pain was again documented as "same." Pet'r Ex. 3 at 75. The note from that date referenced to the flu vaccine: "Pain in right lateral arm after flu shot. [P]ossible bursa inflamed with surrounding spasm." *Id.* However, Dr. Rimbey explained in her letter that she included the note only so that she could later "recall the patient mentioning it as a possibility." Pet'r Ex. 10 at ¶ e2. It was not actually an objective assessment, as Dr. Rimbey "had never heard of such a correlation in [her] 20+ years of practice especially so long after the administration of the shot." *Id.* Notes from March 11, 15, and 21, 2016, continued to reflect that Petitioner's shoulder pain was the "same," and Dr. Rimbey continued to treat the shoulder with range of motion/flexibility exercises, electrical muscle stimulation, and myofascial release. Pet'r Ex. 3 at 76-78. At the March 21, 2016 visit, she also added a home exercise plan, which included a weighted bench press with cross-body rotational punch. *Id.* at 78. The records reflect a gradually-evolving right shoulder issue between February and March 2016. However, it is clear from Dr. Rimbey's notes and her explanation of the treatments that she provided that Petitioner did not present as a patient with a serious issue that had been ongoing for nearly six months.

Petitioner first saw a medical doctor for right shoulder pain on March 23, 2016. Pet'r Ex. 4 at 10-13. Petitioner explained why he did not see a doctor for the pain before that date by describing his dislike of doctors in both his affidavit and his testimony. Tr. 9-10; Pet'r Ex. 2 at ¶ 5. Despite his testimony that he prefers not to go to a doctor "unless [he is] basically dying," Petitioner's pre-vaccination medical records reflect that he visited his primary care provider's office on at least two occasions for non-routine visits related to musculoskeletal pain. On December 2, 2013, Petitioner visited his primary care provider complaining of pain in his right hand that had persisted for four days. Pet'r Ex. 4 at 32-34. The doctor noted that the pain had "started after playing golf [when Petitioner] hit [the] ball hard," but that it was "getting better." *Id.* at 33. A physical examination revealed that the hand was "swollen [and] tender," and Petitioner's range of motion was "ok" according to the doctor. *Id.* at 34. At that visit, Petitioner was instructed to apply heat, take an over-the-counter anti-inflammatory medication for a week, and call if he did not feel better after that time. *Id.* On March 5, 2014, Petitioner visited his primary care provider again, complaining of right back pain which had persisted for four days. *Id.* at 30-32. At that visit, Petitioner reported that he "felt a local pull" after bending at work. *Id.* at 30. He described the quality of his pain as "sharp" and the severity as "mild (1-4)."[26] *Id.* Petitioner reported that the pain was "relieved by changing position." *Id.* The doctor's physical examination revealed mild distress, limited ambulation, tenderness in Petitioner's lumbar spine, and pain with the straight leg test on the right side. *Id.* at 31-32. Petitioner was prescribed a nonsteroidal anti-inflammatory drug and a muscle relaxant; the doctor also noted that Petitioner was "seeing [a] chiropract[o]r." *Id.* at 32. Petitioner's description of his aversion towards doctors is inconsistent with those medical records. At both visits, Petitioner complained of musculoskeletal pain which had persisted for only four days prior to the appointments. The records also reflect that the injuries he complained of at those visits were much less severe than the shoulder injury he alleges resulted

---

[26] The note reads "Severity: **mild (1-4)**; 1-8." Pet'r Ex. 4 at 30 (bold in original). Therefore, his pain level may have ranged as high as an eight at times.

from the flu vaccine.  In addition to his primary care visits, Petitioner's records reflect other regular medical visits.  He received frequent allergy injections, which put him in contact with medical professionals at least monthly.  One record, from June 6, 2016, reflects that Petitioner treated with at least one specialist, a podiatrist.  Pet'r Ex. 4 at 24-25.  The June 6, 2016 note is the only podiatrist note in the record, but it reflects that Petitioner "picked up his new pair of custom orthotic[s] and dropped off his existing pair of orthotics for refurbishment."  *Id.* at 24.  This indicates that it was not his first visit with that provider.  *Id.* at 24.  Petitioner's records clearly illustrate a regular and healthy relationship with many different medical providers, ranging from generalists to specialists for proactive and reactive care.  That history is inconsistent with an aversion to doctors that resulted in a six-month delay for treatment of a severe and chronic injury.

Petitioner's affidavits and testimony, the affidavits of his wife and co-worker, and the medical records from March and April 2016 were generally consistent in describing the timing of shoulder pain as occurring immediately after Petitioner received the flu vaccine on September 29, 2015.[27]  In the Vaccine Program, it is not uncommon for petitioners to delay seeking treatment for an alleged injury for weeks or even months.  Therefore, it is not uncommon for petitioners to have no contemporaneous medical records which corroborate their claims of onset.  However, this case is different than many in the Vaccine Program, because there are numerous records from the time that Petitioner claims his injury began and continuing through the months that followed.  None of these records corroborate Petitioner's timeline of the onset of his injury.  Contemporaneous chiropractic records reflect that Petitioner had a variety of musculoskeletal complaints after he received the flu vaccine, but those complaints were not markedly different than the complaints he presented to the chiropractor before his vaccination.  These records do not provide any evidence that Petitioner suffered from a severe and chronic injury beginning immediately after receiving the flu vaccine.

The undersigned acknowledges that although the contemporaneous medical records do not support Petitioner's account of his injury, they do not expressly negate his testimony, either.  For example, the records do not document that Petitioner ever expressly denied pain or other issues related to his right shoulder between the time of his vaccination and February 8, 2016.  However, Petitioner did not persuasively explain why the records fail to specifically reflect any injury related to his right shoulder.  Although the records from the visits that occurred between March and June 2016 documented that the issue began six months prior at the time of the flu vaccine, all of the providers were relying upon Petitioner's recollection; no one made independent assessments regarding the onset or cause of Petitioner's symptoms.  Petitioner has not persuasively shown that he had any symptoms of a right shoulder injury prior to February 2016.

The undersigned also notes that Petitioner's account of his ongoing pain is inconsistent with his records, which reflect that he continued with many of his usual activities during treatment.

---

[27] On March 23, 2016, Petitioner reported to Dr. Auerbach that his pain had persisted since receiving the flu vaccine, and thus the doctor assessed "chronic right shoulder pain" which was "due to [a] flu vaccination [on] 9/29/2015."  Pet'r Ex. 4 at 11.  On April 5, 2016, the orthopedist, Dr. Reid, also consistently noted that Petitioner reported "acute onset right shoulder pain after receiving a flu shot."  Pet'r Ex. 5 at 11-12.

Petitioner continued to treat with Dr. Rimbey after his diagnosis, and he reported to her that his shoulder pain was the "same" on April 28, May 2, May 6, and May 13, 2016.  Pet'r Ex. 3 at 81-84.  On May 10, 2016, Petitioner told Dr. Reid that he experienced "moderate relief" from the steroid injection he received month prior.  Pet'r Ex. 5 at 5.  At his first physical therapy appointment, on May 17, 2016, Petitioner conveyed that his pain was dull and localized at a level of zero out of ten at rest, going up to five out of ten with activity.  Pet'r Ex. 5 at 21.  Despite Petitioner's testimony that he did not have a garden in 2016, his allergist's records reflected that he was "workin[g] out in [the] yard" on the same day he started physical therapy, May 17, 2016.  Tr. 53; Pet'r Ex. 9 at 84.  Although the note does not specify what yardwork Petitioner was doing on that date, it caused a "poison ivy [rash] over most of [his] body" by the next day.  Pet'r Ex. 9 at 84.  By Petitioner's third physical therapy visit, on May 23, 2016, he reported to the physical therapist that "he only has pain with follow through when golfing" and he "can now reach up and close the hatch on [his] car."  Pet'r Ex. 5 at 17.  Therefore, it appears that Petitioner was also golfing while receiving treatment for his right shoulder injury, at least as of May 23, 2016.  Although Petitioner credited the prednisone he received for poison ivy with much of the improvement to his right shoulder, he did not receive that prescription until later in the day on May 23, 2016.  *See id.* (noting that Petitioner was "seeing the physician right after" his physical therapy visit that day); Tr. 27-28.

The medical records reflect that Petitioner was "much improved" as of June 7, 2016, even though he wrote in his affidavit that he "continue[s] to undergo treatment for [his] shoulder injury through the present."  *Id.* at 5; Pet'r Ex. 2 at ¶ 7.  Petitioner testified that he discontinued treatment specific to his right shoulder as of June 7, 2016.  Tr. 30.  Petitioner continued to regularly receive allergy shots in both arms, and did not express concern in his testimony about continuing to do so despite his stated belief that he was injured by the administration of a flu shot.  Petitioner described the pain he continues to experience as a "constant ache, like the arm is constantly waking up from having fallen asleep located right at the corner of [his] shoulder."  Tr. 31.  He testified that although it is "a dull ache [with] pain around a 6 [out of 10] all of the time . . . if [he] do[es] the wrong thing with [his] arm, it will pop up to around an 8 or a 9.  *Id.*  It is particularly noteworthy that Petitioner reports that his pain is now at a higher level than he reported to the physical therapist at his first physical therapy session.  This is inconsistent with Petitioner's statement that he discontinued treatment and the records reflecting that he was "much improved" as of June 7, 2016.  Tr. 30; Pet'r Ex. 4 at 27.

Based on all of the above, the undersigned finds that **Petitioner experienced a gradual onset of right shoulder pain and range of motion issues that began in February of 2016 and significantly improved in June of 2016, warranting discontinuation of treatment.**

## VII.   Conclusion

Having considered all of Petitioner's medical records and other available evidence, the undersigned finds that Petitioner did not have any significant right or left shoulder injury prior to receiving the influenza vaccination on September 29, 2015.  The undersigned finds that Petitioner's right shoulder injury gradually developed beginning in February of 2016.

No later than **June 13, 2018**, Petitioner shall file a status report stating whether and how he intends to proceed in this matter.

**IT IS SO ORDERED**.

s/Herbrina D. Sanders
Herbrina D. Sanders
Special Master